[Civ. No. 20511. Second Dist., Div. Three. Feb. 28, 1955.]

VITINA R. MONASTERO, Appellant, v. LOS ANGELES TRANSIT COMPANY (a Corporation) et al., Respondents.

Nathan Greitzer for Appellant.

Trippett, Newcomer, Yoakum & Thomas, Melvin L. R. Harris and Fred C. Quimby, Jr., for Respondents.

ASHBURN, J. pro tem.*—Plaintiff appeals from a judgment for defendant which was entered pursuant to a jury verdict. The action is for damages for personal injuries. Plaintiff claims that defendant Meyette, the operator of defendant's streetcar, negligently closed the doors on her, thus inflicting the alleged injuries. She challenges the verdict upon several grounds, one of which is insufficiency of the evidence.

The verdict being against her, appellant's claim in this regard must be examined in the light of the settled practice of resolving all conflicts and conflicting inferences in favor of respondent. The rule is thus stated in *Juchert* v. *California Water Service Co.*, 16 Cal.2d 500, 503 [106 P.2d 886] : "As is always true on such appeals, all conflicts must be resolved in favor of the respondent, and all legitimate and reasonable inferences must be indulged in to uphold the verdict, if possible. It is elementary that when a verdict is attacked as being unsupported, the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the jury. And when two or more inferences can reasonably be deduced from the facts, the reviewing court is without power to substitute its deductions for those of the jury or trial court."

The defendant's streetcar was at the end of the line and passengers were boarding it at the left front side. Plaintiff was one of a group who were so engaged. The car had two folding doors, the right or rear one of which was open for the purpose, the other being closed. According to defendant Meyette, a large woman with a big package was ahead of plaintiff and as she ascended she hit or pulled the lever which operated the doors, the open one began to close, the operator saw it, reached over and immediately adjusted it so the door reopened. He did not see the door close on plaintiff. He

---

*Assigned by Chairman of Judicial Council.

thought that plaintiff might have been brushed by the door, so he asked if she was all right and she said, "Yes, I am." Later she claimed to have been injured and he took her name and address. Plaintiff called as a witness one Carol Whitacre who boarded the same car, but she testified that she had no recollection of seeing plaintiff or of any occurrence such as plaintiff described; that she did not recall seeing plaintiff until she came to see the witness later. Other than plaintiff's own testimony that of Meyette was the only evidence as to what happened on the occasion in question. Her testimony is interesting, though not elevating. For she concluded by telling the jury: "The fact that I lied is deliberate and I hope that will be taken for what it is worth, because everything else—everything I have told here is absolutely the truth."

Plaintiff's own testimony operates in an unintended way to strengthen that of the operator Meyette. She said that he opened both doors for the passengers, that the heavy-set woman went first up the left side of the entrance, then back down and up the right side and leaned against the bar dividing the doors; that while Meyette stood there making change plaintiff was on the second step, holding the bar with her left hand, and Meyette closed both doors at that time; the doors hit her; they closed on her before she could get all the way in, ". . . so all I had was my head out and my arm and my one leg, and the other foot was on the stair, on that second step." Both doors struck her and one foot was on the step and the other ". . . was out because I was trying to get out." Plaintiff also testified that Miss Whitacre told her to try to get out, but the doors would not budge and that Meyette saw her stuck between them. As previously stated neither Miss Whitacre nor defendant Meyette saw any such occurrence. Plaintiff conceded that Meyette, when she asked him to take her name and address, said, "It wasn't my fault; the colored woman was the one who moved the lever."

In the history she gave to Dr. Lyon plaintiff said that one of the passengers had grabbed the door control and the door closed on plaintiff. At the trial she said Meyette closed both doors, that she definitely saw him do it. Some 16 days after the incident in question (which occurred on December 31, 1951), plaintiff signed a written statement for the representative of defendant in which she said: "I boarded behind two other passengers at the front exit doors and the woman in front of me got on and in so doing grabbed a lever which operates the doors and the front doors closed on me——"

At the trial she testified: "Q. However, that is your signature, is that right? A. That is right, but the reason I— anything I said to your adjustors, I didn't give them the right story for the simply reason that they came in and they were very obnoxious to me and I didn't want them to know the truth. . . ." Also: "That is why I wouldn't give any one of them a correct statement. I am doing all my—I am giving all my facts right here. That is why I am having a case right here, and anything that is in here you might just as well discount because I just didn't want to say a word——" Again: "Q. Miss Monastero, just so I understand it now, the statement that you gave to the adjuster, the statement I hold in my hand, you intended that not to be the truth, is that right? A. That's right."

On August 15, 1952, plaintiff's deposition was taken. She, a college graduate, understood that she was sworn to tell the truth, whereupon she testified: "Do you know what it was that caused the doors to close? A. No. Q. Do you know where the lever is on the streetcar that operates those doors? A. No. Q. And you didn't see anybody operating the lever? A. No." This she readily disposed of at the trial, saying: "What I wanted to say, anything on that deposition I would appreciate your not taking any stock in, Judge Scott, for the simple reason that earlier, before the deposition was taken, I called up Mr. Shepard, who at the time was representing the L.A.T.L. and asked him for the name and address of Mr. Meyette, and he would not give it to me." Further questioned she testified: "Q. Now in your deposition that was taken, you also intended that not to be the truth, is that right? A. That is correct." Also: "THE COURT: Did you intentionally testify falsely under oath at the time of the taking of the deposition? THE WITNESS: I did, because this is the place I consider an oath to be taken and tell the truth right here. They gave me quite a dissertation about that. They can put me in prison if they want to. . . . MR. HILLSINGER: . . . Q. The deposition you gave also was not intended to be the truth? A. That's right. If you notice, there are lots of inconsistencies, even as to the questions you asked me about. Nothing jibes in this particular thing. Nothing jibes." All this was summed up in her closing argument in these words: "Regarding the inconsistencies in the deposition taken August 15, and the signed statement to L.A.T.L. adjuster, and statements made at the trial, wrong data, as I mentioned before, was intentionally given in both the above instances. I knew

all along what the streetcar operator's testimony would be and did not wish to give the actual facts until trial in court with the judge and the jurists. . . . Miss Monastero: I am sorry. Apropos the inconsistencies in the deposition, my attorney in the case was quite perturbed over what I did when I told him and admonished me accordingly. I consequently advised him I would relieve him——. . . . As I said, I came here to present the facts. The fact that I lied is deliberate and I hope that will be taken for what it is worth, because everything else—everything I have told here is absolutely the truth.'' So thoroughly did plaintiff establish the unreliability of her own testimony that the jurors could do nothing but reject it *in toto,* leaving her without any evidence of negligence on the part of the motorman.

■ In keeping with her own method of presentation is the point upon which plaintiff's present attorney relies. He states it in this way: ''THE TRIAL COURT ERRED IN' APPOINTING COUNSEL FOR THE ADVERSE PARTY, TO WIT, COUNSEL FOR THE DEFENDANTS TO ASSIST THE PLAINTIFF IN THE TRIAL OF HER ACTION AND IN THE PREPARATION OF JURY INSTRUCTIONS AS HER COUNSEL.'' This startling charge is groundless.

Plaintiff conducted the trial *in propria persona.* This does not appear to have been due to financial reasons. She was then earning $325 a month. And she has had three different attorneys in this case, one who filed the complaint, another who argued a motion for new trial and her present attorney upon appeal.

■ ■ The trial judge labored long and patiently to convince plaintiff of the folly of conducting a jury case in person, she being untrained in the law. He offered to arrange a continuance in order to enable her to get an attorney for the trial but she was insistent upon her right to represent herself. This, of course, was her privilege. (*Gray* v. *Justice's Court,* 18 Cal.App.2d 420 [63 P.2d 1160]; *Culley* v. *Cochran,* 107 Cal.App. 525 [290 P. 484]), but she thereby subjected herself to the same restrictive rules of procedure as does any trial lawyer.

*Ackerman* v. *Southern Ariz. Bank & Trust Co.,* 39 Ariz. 484 [7 P.2d 944]: ''Under the law one may be his own attorney if he wants to be. A layman with resources who insists upon exercising the privilege of representing himself must expect and receive the same treatment as if represented by an attorney—no different, no better, no worse.''

*Knapp* v. *Fleming,* 127 Colo. 414 [258 P.2d 489]: ''A liti-

gant is permitted to present his own case, but, in so doing, should be restricted to the same rules of evidence and procedure as is required of those qualified to practice law before our courts; otherwise, ignorance is unjustly rewarded.''

To same effect is *Biggs* v. *Spader*, 411 Ill. 42 [103 N.E.2d 104, 107].

The trial judge explained this to plaintiff with particular reference to instructions. Witness this colloquy: ''THE COURT: The court requires the parties to produce before the trial starts the instructions which are to be given to the jury. Those are instructions that have to be carefully prepared, applicable to the facts of the case. That is the function of the attorney in the case and not the function of the court. The court merely considers and passes upon the instructions that are offered and selects those that are applicable. MISS MONASTERO: Well, what type of instructions do you mean? Perhaps I might be able to set it up for you. THE COURT: Miss Monastero, the court is suggesting again that if you have any reasonable degree of desire to win this case, if you think you have a case, you are being completely unjust to yourself in not having the benefit of an attorney's labors in the preparation and presentation of your case. You cannot do it properly without a lawyer.'' Again: ''THE COURT: All right. Do you know anything about instructions at all? MISS MONASTERO: No. I just read his instructions as they are there.'' Being unable to persuade plaintiff of the practical necessity of legal representation, the court, addressing defendant's attorney, said: ''THE COURT: Mr. Hillsinger, the court will impose upon you the added burden of assisting the court, as an officer of the court, by handing to Miss Monastero instructions that ordinarily would be requested in connection with matters of this kind, and we will do the best we can. MR. HILLSINGER: I will have those instructions the first thing in the morning, your Honor.''

Notwithstanding the cautions just mentioned the court continued throughout the trial to assist plaintiff in the presentation of her case, guiding her as to peremptory challenges, assisting her in examining jurors as to cause for challenge, advising her of the right to examine defendant Meyette under section 2055, Code of Civil Procedure, advising efforts to compromise, emphasizing the duty of defendant to exercise the highest degree of care and carefully scrutinizing all proffered instructions. At the close of the case plaintiff said this: ''At this time I do want to thank Judge Scott for

having been of such wonderful assistance in helping me actually present my case to a conclusion, especially after he indicated my testimonies weren't actually correct when the deposition was taken, and the original statement wasn't correct. At the same time I do want to thank him too for trying to keep this in as orderly a procedure as possible, being I was inexperienced, and I want to thank you all for taking the time to come and bearing this out with me. Thank you very much."

The record discloses that all instructions requested by plaintiff and given (presumably furnished to her by defendant's attorney), were taken from BAJI.[1] The judge carefully modified most of the requests tendered by both parties, and gave two instructions on his own motion, both of which were designed to clarify the rights of plaintiff. The instructions as given were not slanted in defendant's favor. The record indicates only a conscientious effort on the part of defendant's attorney, Mr. Hillsinger, to help the judge help the plaintiff in the matter of instructions. And appellant's brief does not claim error in any of those which were given (except as to contributory negligence) or in refusal to give any of plaintiff's requests. Counsel does assert that the court should have given a res ipsa loquitur instruction on its own motion, a matter presently discussed.

Experience in trial of cases indicates that all too often litigants who appear in propria persona deliberately attempt to capitalize upon their own ignorance or appearance of ignorance. In this case plaintiff forced upon the trial judge the necessity of preparing all of plaintiff's requested instructions or seeking assistance where it could be found. And so he called upon counsel for defendant to help,—to carry ". . . the added burden of assisting the court, as an officer of the court, by handing to Miss Monastero instructions that ordinarily would be requested in connection with matters of this kind. . . ." In no sense of the word did the court appoint counsel for the adverse party to assist plaintiff in the trial or "in the preparation of jury instructions as her counsel." In no manner or degree was plaintiff prejudiced by Mr. Hillsinger's selection of BAJI instructions for her to request or by the court's giving the same after appropriate modifications. .

Appellant asserts error because the court did not give a res ipsa loquitur instruction on its own motion. She

---

[1]Book of Approved Jury Instructions of Los Angeles Superior Court.

did not make such a request. The court is not required so to do in a civil case even if the instruction be appropriate. ■ The duty rested on plaintiff to request it; otherwise any right to the instruction was waived. (*Ornales* v. *Wigger*, 35 Cal.2d 474, 479, 481 [218 P.2d 531].)

■ If a passenger is injured through some unforeseeable conduct of another passenger no presumption of negligence arises against the carrier. (*Steele* v. *Pacific Electric Ry. Co.*, 168 Cal. 375, 379 [143 P. 718]; see also 140 A.L.R. 1194, 1202, 1205.) The rule is illustrated by these cases: *Ken-Ten Coach Co.* v. *Davis*, 289 Ky. 329 [158 S.W.2d 624] (one passenger closed door on foot of another); *McDonnell* v. *New York Cent. & H. R. R. Co.*, 35 App.Div. 147 [54 N.Y. Supp. 747] (passenger inadvertently set emergency brake causing sudden stop of train); *Pennsylvania R. Co.* v. *Cook*, 180 Md. 633 [26 A.2d 384, 140 A.L.R. 1188] (passenger pulled cord and caused premature start of train); *Eaton* v. *New York, N. H. & H. R. R.*, 227 Mass. 113 [116 N.E. 815] (one passenger jostled another knocking her against brake wheel); *Intriligator* v. *Goldberg*, 299 Mass. 333 [12 N.E.2d 730] (one taxicab passenger slammed door on hand of another). In all such instances the element of exclusive control of defendant over the instrumentality causing the injury was absent at the time of the accident.

■ Moreover, this is a case in which plaintiff has fully as much knowledge of the cause of the accident—not only the fact but the cause—as has defendant. And that is well-nigh conclusive of the inapplicability of res ipsa loquitur. *Billeter* v. *Rhodes & Jamison, Ltd.*, 104 Cal.App.2d 137, 147 [231 P.2d 93]; *Alexander* v. *Wong Yick*, 25 Cal.App.2d 265, 269 [77 P.2d 476]; *Biondini* v. *Amship Corp.*, 81 Cal.App.2d 751, 768 [185 P.2d 94].) But the Supreme Court has recently said: "It seems clear, however, that the doctrine may be applied even though the defendant is not in a better position than plaintiff to explain what occurred if it appears more probable than not that the injury resulted from negligence on the part of defendant." (*Zentz* v. *Coca Cola Bottling Co.*, 39 Cal.2d 436, 445 [247 P.2d 344].) And *Baker* v. *B. F. Goodrich Co.*, 115 Cal.App.2d 221, 229 [252 P.2d 24], points out that "Where the evidence is conflicting or subject to different inferences, it is for the jury, under proper instructions, to determine whether each of the conditions necessary to bring into play the rule of res ipsa loquitur are present." If the Zentz language, quoted above, means that the jury

rather than the court must determine whether "it appears more probable than not that the injury resulted from negligence on the part of the defendant" that would indicate such an instruction would have been appropriate upon the basis of plaintiff's testimony considered apart from the conflicts in it. But it is clear that the jurors, who unanimously and promptly found against plaintiff, would have rejected the inference had such an instruction been given. This is true because that imponderable could not possibly outweigh the shocking self-stultification of the plaintiff.

Appellant further complains of the giving of instructions on contributory negligence. That defense was alleged. Plaintiff argued the question to the jury. Defendant's attorney did not do so. Plaintiff requested an instruction dealing with the subject. The evidence does not afford basis for such an instruction, but the giving of one must be in fact prejudicial before appellant can successfully complain. (*Kirk* v. *Santa Barbara Ice Co.*, 157 Cal. 591, 595 [108 P. 509].) This case did not turn on contributory negligence. The verdict rested upon a rejection of plaintiff's testimony, which resulted in an absence of any evidence of negligence on defendant's part.

There has been no miscarriage of justice here. The judgment is a righteous one.

Affirmed.

Shinn, P. J., and Vallée, J., concurred.