[Civ. No. 10172. Third Dist. Jan. 9, 1962.]

IRVIN GARLOCK, Plaintiff and Appellant, v. FENWICK COLE et al., Defendants and Respondents.

Ted W. Isles for Plaintiff and Appellant.

Daniel S. Carlton, Glenn D. Newton and Richard J. Asbill for Defendants and Respondents.

PIERCE, J.—Plaintiff appeals from a summary judgment for defendants in a malpractice action.

The sole question on appeal is whether any triable fact was before the trial court on the issue of the running of the one-year statute of limitations. (Code Civ. Proc., § 340, subd. 3.)

The issues framed by allegations of the complaint, substantially denied by the answers, were: That on November 27, 1957, respondent physicians so negligently injected a drug into appellant's left arm that it became permanently deformed; that respondents knew this but appellant did not and was kept ignorant of the nature and extent of the injury by representations of respondents that the arm would return to normal after the expiration of one year; that appellant, relying on these representations, returned after a year, as directed, and learned then from respondents that the injury was permanent but that a settlement would be made. Appellant alleges that he did not learn that respondents intended no settlement until July 1959. Complaint was filed August 20, 1959.

The proceedings for summary judgment were on affidavit and counteraffidavit. Said affidavits, however, rely entirely on depositions for their factual source, one the deposition of appellant, Irvin D. Garlock, the other the deposition of one of respondents, Fenwick Earl Cole, M.D. These depositions, construing them most liberally, and resolving all doubts and

contradictions in appellant's favor, as we are bound to do (*Craig* v. *Earl,* 194 Cal.App.2d 652, 655 [15 Cal.Rptr. 207]), show the following:

On November 27, 1957, appellant, suffering from shingles, was referred by another physician to respondent Cole, a doctor of medicine, for treatment. Dr. Cole gave appellant two injections, one a mixture of vitamin B-12 and pretomide, injected into the left arm.

The injection was to have been the first of a series for cure of the shingles. Within 10 or 15 minutes after the injection described appellant experienced a burning sensation in his arm and three fingers and the thumb of his left hand became numb and partially paralyzed. Two days later appellant saw Dr. Cole and complained of the condition of his left hand. Dr. Cole had his nurse give appellant a heat treatment. Approximately a week later appellant again saw Dr. Cole who again examined the hand and told appellant he wanted to have him examined by another physician, the respondent Dr. Hinman, with whom Dr. Cole was associated. This joint examination took place two days later and, according to appellant, the two doctors "just kind of shook their heads and didn't know." Dr. Hinman said he would like appellant to come back in a month and Dr. Cole said he would turn it over to Dr. Hinman. About a month later (January, 1958) Dr. Hinman again looked at appellant's hand and, according to appellant, "he said there wasn't *too much* they would be able to do about it . . . *that it would take about* a year. He said that the nerves would grow about the thickness of a hair, and I can't remember for sure whether he said a week or ten days, or whatever it was. Anyhow, he said that is all the nerve would grow in that length of time, and he said it would take a year at least to see any improvement. He said there was nothing else you could do about it. . . . He just said it would take at least a year, and he says then to come back and he would take a look at it."

Appellant did go back to these doctors as directed. In the meantime, in the spring of 1958, appellant having experienced some difficulty in his right shoulder, apparently unrelated to the shingles or the left arm injection, was referred by a physician other than respondents, to a Sacramento physician, Dr. Petzold.

After Dr. Petzold had examined his right arm and shoulder, appellant mentioned that he was having trouble with his left hand and testified: "I told him what had happened."

There were so many interruptions of the witness' account in his deposition of this visit to Dr. Petzold that it never became completely clear just what had occurred thereat. But it was clear that no X-rays were taken, no tests were made and that the observation of, and discussion regarding, the left hand were casual. Appellant related a statement to him by Dr. Petzold. During the conversation the doctor told him that he ''would just have to learn to live with it.''

Appellant did nothing further about his left hand until March of 1959 when he returned to Doctors Cole and Hinman who again looked at it. During the intervening period the crippled condition of appellant's left hand had continued and worsened. At the March visit Dr. Hinman said: ''Well, it is gone. . . . The only thing we can do is call the insurance company and try to get him a settlement.'' Thereafter, at Dr. Cole's request, appellant was examined by a Dr. Adams who referred him to Dr. Petzold. Appellant refused hospitalization and, so far as the record shows, has had no further examination or care. This action, as stated above, was commenced in August, 1959.

The trial court, in ruling upon and granting the motion for summary judgment, took the position that ''the plaintiff was well aware of the fact that something was wrong immediately after receiving the injection . . . and if it be a fact that this was due to negligent treatment by the doctor, the cause of action arose then and was barred in one year''; that if not barred then it was barred within one year after appellant ''was informed by the doctor in Sacramento to the effect that his condition was apparently permanent.'' The trial court saw no ''representations [by respondents] guaranteeing that he [appellant] would recover . . . but only that it might improve in about a year.''

In this statement we believe the trial court has erred both in the application of rules relating to summary judgments and by inaccurate and incomplete treatment of the law governing the statute of limitations in malpractice actions.

It is not the function of the court in passing upon a motion for summary judgment to *weigh* the evidence. Its role in such proceedings is not as a trier of facts. *Ascertainment* of triable issues, not *determination* thereof fixes the judicial function.

In *Estate of Kelly,* 178 Cal.App.2d 24 [2 Cal.Rptr. 634], it is said by the court (Shepard, J.) on pages 29, 30:

''. . . In the last analysis, then, the primary duty of the

trial court in passing on a motion for summary judgment is to discover whether or not there are presented by the affidavits any really triable issues, and not to pass on the issues themselves. (*California Lettuce Growers* v. *Union Sugar Co.,* 45 Cal.2d 474, 488 [26] [289 P.2d 785, 49 A.L.R.2d 496]; *Coyne* v. *Krempels, supra,* [36 Cal.2d 257 (223 P.2d 244)] page 260 [1].) In other words, as was said in *Walsh* v. *Walsh,* 18 Cal.2d 439, 441 [1] [116 P.2d 62], '. . . issue finding rather than issue determination is the pivot upon which the summary judgment law turns.' ''

The one-year statute of limitations (Code Civ. Proc., § 340, subd. 3) governs the action for malpractice. (*Stafford* v. *Shultz,* 42 Cal.2d 767, 775 [270 P.2d 1].) This is true even where, as here, the plaintiff alleges a cause of action for deceit in defendant's misrepresenting or withholding the nature and extent of the injury. (*Tell* v. *Taylor,* 191 Cal.App.2d 266, 271 [12 Cal.Rptr. 648].) However, the statute does not commence to run until the plaintiff discovers his injury *due to defendant's wrongful act* or through the exercise of reasonable diligence should have discovered it. (*Huysman* v. *Kirsch,* 6 Cal.2d 302 [57 P.2d 908].) Actual or constructive notice not only of the condition but of its negligent cause and deleterious effect is implicit in this definition. Moreover, the statute does not ordinarily commence to run while the physician-patient relationship continues since ''exercise of reasonable diligence'' does not usually require the patient to doubt and challenge the doctor in whom complete confidence is traditionally reposed. (*Stafford* v. *Shultz, supra; Mock* v. *Santa Monica Hospital,* 187 Cal.App.2d 57, 63-64 [9 Cal.Rptr. 555]; *Hundley* v. *St. Francis Hospital,* 161 Cal.App.2d 800, 806 [327 P.2d 131]; *Myers* v. *Stevenson,* 125 Cal.App.2d 399, 402 [270 P.2d 885]; *Costa* v. *Regents of University of Calif.,* 116 Cal.App.2d 445 [254 P.2d 85].)

It has been pointed out by this court in *Bowman* v. *McPheeters,* 77 Cal.App.2d 795, 800 [176 P.2d 745], that the relationship between physician and patient is a fiduciary one. As stated by the court (per Peek, J.) on page 800:

''. . . As fiduciaries it was the duty of defendants to make a full and fair disclosure to plaintiff of all facts which materially affected his rights and interests.''

It is further stated on page 801, quoting from *Hobart* v. *Hobart Estate Co.,* 26 Cal.2d 412, 439-440 [159 P.2d 958]:

'' '[I]t is recognized that in cases involving such a relationship facts which would ordinarily require investigation

may not excite suspicion, and that the same degree of diligence is not required.' ''

The *Bowman* case was cited, quoted from and approved in *Stafford* v. *Shultz, supra.*

Respondents attempt to distinguish the cases of *Bowman* v. *McPheeters, supra,* and *Stafford* v. *Shultz, supra,* because they are ''demurrer'' cases. Where, as here, appellant's ''counter-affidavit,'' i.e., his deposition, is an elaboration in detail and in evidentiary form of the ultimate facts alleged in his complaint, the ''summary judgment'' rules are indistinguishable from those applicable to appeals on demurrer.

Applying the foregoing rules to the facts disclosed in the depositions here, this court cannot say that there was no triable issue of fact on the question of the bar of the statute of limitations. As we see it, the statements of two doctors to their patient to whom they owed the duty of fiduciaries that it would take ''about a year'' or ''at least a year to see any improvement,'' coupled with a description of ''nerves growing about the thickness of a hair'' every ''week or ten days'' to achieve that result and with the instruction to come back within a year, are susceptible to construction as representations that the condition was not permanent and would be ultimately cured.

Appellant was gullible, no doubt, to accept the chronology of the regrowth of damaged nerves alleged to have been narrated by Dr. Hinman, but appellant is apparently not an educated person, and some naiveté is not unnatural when one deals with a doctor in whom one has a right to repose confidence. It cannot be said at this stage of the litigation, therefore, that there could be no triable issue here on the question of appellant's right to rely upon the representations alleged to have been made by these doctors under whose care he remained.

Nor can the apparently off-hand assertion by Dr. Petzold to appellant that the latter ''would have to learn to live with'' his hand be said to change appellant's right still to rely upon his own doctors. Appellant had not consulted Dr. Petzold professionally for either diagnosis or prognosis regarding his hand. Secondly, the doctor's statement was made without neurological or other test, without X-rays, and apparently without other basis than mere observation and the history related by appellant. And, finally, the statement itself is not so unequivocal as to demand that it be understood as a solemn pronouncement of *permanent* deformity; particularly where it

is remembered that appellant claims already to have been advised by his own doctors that the period of nerve repair would be protracted.

Also, it seems to us, to assert that Dr. Petzold, by merely looking at appellant's hand, could diagnose and pronounce a permanent and incurable disability is tantamount to the assertion that this would be a medical fact equally within the knowledge of these respondents. Such a fact, if it were a fact, would be one which it would be the clear duty of these doctors to disclose to their patient and if not disclosed would constitute the most palpable fraud.

Three cases relied upon by respondents, but not in point, may be briefly noticed. In *Calvin* v. *Thayer,* 150 Cal.App.2d 610 [310 P.2d 59], and in *Hemingway* v. *Waxler,* 128 Cal. App.2d 68 [274 P.2d 699], plaintiffs did not return to defendant doctors after the original erroneous and negligent diagnosis. They were thereafter fully apprised of the true situation by other physicians, upon whom they relied; but they took no action against the defendants until more than a year after discovery. In *Ehlen* v. *Burrows,* 51 Cal.App.2d 141 [124 P.2d 82], plaintiff, knowing by defendant-physician's diagnosis, of the existence of four infected teeth, authorized their extraction, but took no reasonable action when the physician also extracted three other sound teeth by mistake. The rule that a patient may rely upon the acts of his physician is subject to some limitation. The extraction of sound teeth, unexplained or unexcused except as a mistake, is obviously such a limitation.

This discussion should not conclude without underscoring that, in liberally construing and asserting the depositions most favorably to appellant (as we are required to do), we are stating that which has not yet been proved and may never be. We have merely accepted the appellant's story. Summary judgment and demurrer reversals are untrustworthy source materials for fact finders.

The judgment is reversed.

Peek, P. J., and Schottky, J., concurred.

Respondents' petition for a hearing by the Supreme Court was denied March 7, 1962.