125 Cal.App.3d 623 (1981)
178 Cal. Rptr. 167
MARY L. NELSON, Plaintiff and Respondent,
v.
FRANK L. GAUNT, Defendant and Appellant.
Docket No. 44625.
Court of Appeals of California, First District, Division Two.
November 13, 1981.
*628 COUNSEL
John F. Hassler for Defendant and Appellant.
Belli & Choulos, Daniel U. Smith and Thomas J. LoSavio for Plaintiff and Respondent.
OPINION
TAYLOR, P.J.
Defendant, Frank L. Gaunt, appeals[1] from a judgment entered on a jury verdict awarding $450,000 in compensatory and $1.5 million in punitive damages to a former patient, Mary L. Nelson, in her action for assault and battery, fraud and intentional infliction of emotional distress. Gaunt argues that: 1) each of Nelson's causes of action was barred by the one-year statute of limitations for malpractice; 2) his decision to represent himself was not voluntarily made; 3) the court erred in the admission of certain evidence; 4) errors in the instructions; 5) the compensatory damage award was excessive and the punitive damages award was not supported by the evidence; and 6) Nelson's counsel was guilty of prejudicial misconduct. For the reasons set forth below, we have concluded that the judgment should be affirmed.
*629 Viewing the record in favor of the judgment and verdict, the following facts appear:
On May 28, 1968, Nelson consulted Gaunt at his San Jose office about the possibility of breast augmentation by an implant procedure. Gaunt told her that implants were not satisfactory but that he had an alternate procedure that was simple, inexpensive, free of side effects and could be done in his office. This procedure involved the use of an "inert substance" that would have "absolutely no side effects." Nelson replied that she had not brought any money or a checkbook, as she had anticipated that any procedure would have to be done in a hospital at a later date. Gaunt offered to provide her with a counter check. After Nelson unsuccessfully attempted to reach her husband by telephone, she agreed to the injections that day and paid with the proffered counter check. On June 25, 1968, Nelson went to Gaunt's office in Beverly Hills for a second set of injections. After she had been prepared for the injection, she overheard Gaunt ask his assistant to "get the silicone." This was the first time she heard the word "silicone." She received the second set of injections and paid in cash, as requested.
Nelson called Gaunt as an adverse witness. He did not recall treating her but acknowledged his signature indorsing the counter check written by Nelson. He denied having an office in San Jose in May 1968. He did not recall giving any silicone injections after 1967. Only after his arrest in 1966 or 1967 had he become aware that the State Department of Public Health (State Public Health) required an approved application to administer silicone injections. He also stated that he did not become aware of the federal and state permit requirements for silicone until 1970. Gaunt maintained that after his arrest, he ceased to inject silicone.
Nelson's witness Kathleen Woodall testified that she received a series of breast augmentation silicone injections from Gaunt between March 18 and May 20, 1968, at his San Jose office.
Nelson's witness Willis Worley testified that he had arrested Gaunt on February 8, 1968, in his San Jose office for use of silicone. State Public Health had been informed by the Federal Food and Drug Administration (FDA) that silicone was considered dangerous for use in human body tissue. In 1965 or 1966, the FDA had obtained an injunction prohibiting transportation of silicone across state lines against the sole United States manufacturer of medical grade silicone. Silicone was *630 then classified as a "new drug" that could be administered only under scientific circumstances after an application for this limited use had been approved by either the FDA or State Public Health. Based on information received from the Santa Clara County District Attorney that Gaunt was using silicone to inject patients, State Public Health ascertained that neither the state nor federal records indicated that Gaunt had applied for a permit for silicone use. On February 6, 1968, State Public Health filed a sworn declaration and obtained a warrant for Gaunt's arrest on two counts of violation of former Health and Safety Code section 26288,[2] a misdemeanor. On February 8, 1968, Worley and others arrested Gaunt in San Jose. At the time of the arrest, Worley informed Gaunt that use of silicone without an approved application was against the law.
In October 1968, Nelson discovered two lumps in her left breast. On November 9, 1968, she consulted Dr. Harrison Kornfield and told him that she had received silicone injections in both breasts. Dr. Kornfield opined that in 1968, it was not known whether or not silicone was a safe substance to inject into a human body. However, silicone had not been approved by the FDA for such a purpose and, therefore, should not be used until proved safe. It was known that silicone might be unstable and metabolize, and could move from one place to another within the body; the degree of reaction in humans was not known but malignant cancer was a potential.
Dr. Kornfield's examination of Nelson revealed additional lumps that she had not detected. Kornfield suspected that these lumps were silicone granuloma or nodules of silicone rather than an intrinsic breast problem; however, he was unable to make certain. Nelson's X-rays showed shadows that were more compatible with a diagnosis of loose fluid than malignancy. Kornfield consulted with his associates and then referred Nelson to Dr. Robert Chase, chief of surgery and chief of plastic and reconstructive surgery at Stanford, for further evaluation. The physicians agreed that her situation was unusual and dangerous because of the presence of silicone, the inability to detect normal breast tissue and to determine whether or not the lumps were cancer. No biopsy was performed as it would only prove the presence of silicone granuloma which was not necessary since the presence of silicone was already known. *631 Any biopsy surgery would leave scar tissue that might compromise later surgery and the possibility of reconstructive implants. A syringe could not be used to withdraw the liquid silicone since it was in droplets throughout the breasts and not in one large identifiable mass. The physicians agreed to wait to remove the breast tissue and monitor Nelson closely for any change in her condition.
Nelson was frequently reexamined by Dr. Kornfield. After his examination on July 28, 1971, Kornfield concluded that her condition had changed substantially and that surgery was now imperative. Although the X-rays showed no shadows generally associated with malignancy, a mass in each breast had overtaken the normal breast tissue. Nelson also had enlarged lymph nodes under both arms, a symptom usually associated with malignancy. Again, Kornfield was unable to determine if Nelson's condition was due to the presence of silicone, whether the silicone had caused any malignancy or if any malignancy was present. On August 10, 1971, Nelson had a double mastectomy; in addition, masses were removed from her waist and shoulders. Pathology reports revealed that silicone was present and the tissue removed was infarcted (dead due to lack of blood supply), but no malignancy was found. In 1973, additional silicone was removed from her rib area. A second set of protheses was implanted in 1974. These had to be removed in 1975 when a third set was implanted and proved successful.
During the time Nelson was involved in the above mentioned medical consultations and surgeries, she developed several emotional distress reactions. She was afraid that the lumps developing in her breasts were malignant, had nightmares about dying, and became sufficiently withdrawn and depressed to seek psychiatric help for that condition. Her family life was disrupted; she was unable to care for her children and required help with household responsibilities. Her husband left her on several occasions and ultimately they were divorced.
Plaintiff's original complaint filed on November 4, 1971, alleged malpractice and assault and battery by use of an illegal substance. The amended complaint filed on September 29, 1972, added fraud. The court granted Gaunt's motion for a summary judgment on the cause of action for malpractice on grounds of the one-year statute of limitations of former Code of Civil Procedure section 340.5.[3] As to the fraud *632 causes of action, the court ruled that the applicable statute of limitations was the three-year period of Code of Civil Procedure section 338,[4] and that the existence of fraud, as well as the application of the statute of limitations was a question of fact for the jury. Thus, as to the causes of action for assault and battery, the application of the statute of limitations was a jury question also. At the conclusion of the trial, the court granted Nelson's motion to amend the complaint to conform to proof to add a cause of action for intentional infliction of emotional distress. The verdict in favor of Nelson awarded her general and special damages of $450,000 and punitive damages of $1.5 million. The special interrogatories indicated that the verdict was based on fraud, battery and intentional infliction of emotional distress.
(1a) Gaunt maintains that all of Nelson's causes of action are for injuries as a result of medical treatment and, therefore, are controlled by the one-year statute of limitations for medical malpractice. He contends that since Nelson discovered her injuries when she first consulted Dr. Kornfield on November 9, 1968, all of her causes of action were barred by former Code of Civil Procedure section 340.5, as of November 9, 1969.
Gaunt relies on Tell v. Taylor (1961) 191 Cal. App.2d 266 [12 Cal. Rptr. 648], Garlock v. Cole (1962) 199 Cal. App.2d 11 [18 Cal. Rptr. 393], and Weinstock v. Eissler (1964) 224 Cal. App.2d 212 [36 Cal. Rptr. 537], which held that the one-year statute applies to a cause of action for deceit based on the physician's false representation or fraudulent concealment of the nature and extent of the injury. In both Tell and Garlock, the medical malpractice action was brought *633 against a physician for treatment of either an injury or an illness. In the instant case, Nelson was well and seeking an elective medical procedure.
In Weinstock, supra, 224 Cal. App.2d 212, the patient was in the hospital and consented to an angiogram. He alleged that he had been improperly advised as to the necessity of the procedure and the risks involved, that he had never consented to a spinal tap, which was also performed, and as a result of the procedures had sustained partial paralysis and loss of speaking ability, as well as other injuries. The complaint was filed 15 months after the procedures were performed and pled 3 causes of action: medical malpractice, fraud and battery. The court cited Tell and Garlock, both supra, but held that none of the three causes of action were barred by the statute of limitations. Relying on Myers v. Stevenson (1954) 125 Cal. App.2d 399, 401-402 [270 P.2d 885], which held that the statute of limitations for malpractice does not ordinarily commence to run while the physician-patient relationship continues, the court held that this cause of action had been brought within one year after the physician-patient relationship had terminated. Further, since an operation performed on a person without his consent constitutes a technical assault and battery (Valdez v. Percy (1939) 35 Cal. App.2d 485, 491 [96 P.2d 142]; Hundley v. St. Francis Hospital (1958) 161 Cal. App.2d 800, 806 [327 P.2d 131, 80 A.L.R.2d 360]), the court concluded that the allegation concerning the spinal tap procedure could be sustained on a battery theory. As plaintiff alleged that his consent to the angiogram had been induced by false representations on the part of the physician, it was in essence an unauthorized procedure and a battery.
The defendants in Weinstock, supra, 224 Cal. App.2d 212, had maintained that the battery and fraud actions were new causes of action which did not relate back to the filing of the original complaint and, therefore, were barred by the statute of limitations. The court, however, held (at p. 235), that while the battery and fraud causes of action expressed a change of legal theory, they stemmed from the same legal obligation of the defendant and, therefore, were not barred by the statute of limitations. As the court in Weinstock did no more than overrule the demurrers and did not reach the merits of the case, we must, therefore, look to other authorities relating to the nature and extent of information that must be given by the physician to the patient before the patient can give a knowledgeable consent to a medical procedure or treatment.
*634 Bowman v. McPheeters (1947) 77 Cal. App.2d 795 [176 P.2d 745], held that a fiduciary relationship exists between the patient and the physician. As a result, the physician has a duty to disclose fully and completely the nature and extent of injuries and any material concealment or misrepresentation will amount to fraud sufficient to entitle the party injured thereby to a cause of action. The duty of disclosure is fiduciary in nature because of the confidential patient-physician relationship, the duty of disclosure is measured by fiduciary standards (not limited by medical standards), and the physician subjects himself to liability should he withhold facts necessary to a total disclosure (Stafford v. Schultz (1954) 42 Cal.2d 767, 777 [270 P.2d 1]).
In Cobbs v. Grant (1972) 8 Cal.3d 229 [104 Cal. Rptr. 505, 502 P.2d 1], our Supreme Court expressly recognized the patient's right to disclosure of that information essential to give knowledgeable consent to medical treatment. Cobbs requires that a physician must disclose all information relevant to a meaningful decisional process and necessary to form the basis of an intelligent consent by the patient to the proposed treatment. The disclosure must include the risk of bodily harm, problems of recuperation, an explanation of complications which might possibly occur in complex surgery, and beyond that minimal disclosure, such additional information as a skilled practitioner of good standing would provide under similar circumstances (pp. 244-245). The duty of disclosure is a function of the trust, confidence and dependence of the patient and should not be restricted by the confines of standard medical practice. Although Cobbs does not expressly state that the duty of disclosure is a fiduciary duty, such a holding is implicit and entirely consistent with the prior case law discussed above.
(2a) Thus, in pleading a cause of action against a physician for injuries resulting from a procedure that was performed without sufficient information for knowledgeable consent, two different legal theories are relevant: negligence or battery. Cobbs, supra, held that a physician's failure to disclose a remote risk requires that the action sound in negligence (p. 241). Since battery is an intentional tort, the battery theory should be reserved for those circumstances where a doctor performs an operation to which the patient has not consented. When the patient gives permission to perform one type of treatment and the doctor performs another, the requisite element of deliberate intent to deviate from the consent given is present (p. 240). Thus, Cobbs implies that the failure to discuss the nature of the treatment sounds in battery.
*635 (1b) In the more egregious situation in the instant case, a fraud theory is apposite. The instant facts go beyond either negligence or battery and are somewhat analogous to cases involving misrepresentation in the sale of property, as recently suggested.[5] Such cases can be tried on either a fraud or negligence theory, depending on the defendant's state of mind: whether he intentionally or negligently misled the plaintiff.
(3) Fraud is an intentional tort, the elements of which are 1) misrepresentation; 2) knowledge of falsity; 3) intent to defraud, i.e., to induce reliance; 4) justifiable reliance; and 5) resulting damage (Harazim v. Lynam (1968) 267 Cal. App.2d 127, 130 [72 Cal. Rptr. 670]; Seeger v. Odell (1941) 18 Cal.2d 409, 414 [115 P.2d 977, 136 A.L.R. 1291]).
(1c) The uncontroverted evidence indicated that Gaunt represented that the substance to be injected was safe, inert and with "absolutely no side effects." In fact, he knew that the substance was silicone. Further, and more importantly, at the time of Nelson's injections, Gaunt knew his use of silicone was illegal as he had been arrested only a few months earlier. Gaunt admitted that from the date of his arrest, he knew that State Public Health and FDA considered silicone unsafe for injection into human tissue. Yet, he injected Nelson without telling her: 1) the name of the substance; 2) the fact that it could be used only under scientific circumstances; 3) even under those conditions, its use required state or federal approval; and 4) he did not have a permit.
(4) A physician is under a fiduciary duty to disclose information to the patient (Bowman v. McPheeters, supra, 77 Cal. App.2d 795; Stafford v. Shultz, supra, 42 Cal.2d 767), and that information must be relevant to a meaningful decisional process and necessary to form the basis of an intelligent consent by the patient to the proposed treatment (Cobbs v. Grant, supra, 8 Cal.3d 229). (2b) Here, Gaunt provided Nelson with false and misleading information and knowingly concealed information that was material to the cause of Nelson's injuries. There is evidence that the procedure to which Nelson consented was substantially different from that which was performed and sufficiently different to amount to a battery.
(1d) We, therefore, conclude that the trial court did not abuse its discretion by denying defendant's affirmative defense of the one-year *636 statute of limitations on the fraud cause of action and in holding that it was for the jury to determine whether or not the three-year fraud statute of limitations would bar Nelson's fraud actions.
Gaunt argues that Sanchez v. South Hoover Hospital (1976) 18 Cal.3d 93 [132 Cal. Rptr. 657, 553 P.2d 1129], Wells Fargo Bank v. Superior Court (1977) 74 Cal. App.3d 890 [141 Cal. Rptr. 836], and Dujardin v. Ventura County Gen. Hosp. (1977) 69 Cal. App.3d 350 [138 Cal. Rptr. 20], are dispositive of the statute of limitations issue in the instant case. Sanchez, Wells Fargo and Dujardin involved professional negligence and the application of Code of Civil Procedure section 340.5. Here, each of Nelson's causes of action was for an intentional tort.
We hold that where, as here, a physician knowingly and intentionally represents that he can administer safely a substance that, in fact, can be administered only under restrictions and controls of state or federal authority, and he administers that substance without the requisite permit and without informing the patient of the restrictions and dangers, the patient can maintain an action for fraud as well as malpractice. Under these circumstances, a physician, like any other fiduciary, is liable for his fraudulent conduct.[6] We think that the trial court properly concluded here that the longer limitations period of Code of Civil Procedure section 338, subdivision 4 was applicable and that the question was for the jury as to each cause of action.
(5) Gaunt next maintains that the court erred by permitting Nelson to amend her complaint at trial to include the cause of action for intentional infliction of emotional distress. A trial court has broad discretion to allow the filing of amendments to pleadings to conform to proof after a trial has been concluded (Rieger v. Rich (1958) 163 Cal. App.2d 651, 666 [329 P.2d 770]). Granting leave to file such an amendment is not an abuse of discretion unless the amendment brings new and substantially different issues into the case (Trafton v. Youngblood (1968) 69 Cal.2d 17, 31 [69 Cal. Rptr. 568, 442 P.2d 648]). Nelson's cause of action for intentional infliction of emotional distress was based on the *637 same fact situation that led to her other causes of action and did not raise a new and substantially different issue. The trial court did not abuse its discretion by allowing the amendment to conform to the proof.
(6) Gaunt contends that his decision to represent himself was not voluntarily made, but was the result of coercion by the trial court. The record indicates that on the day set for trial (Nov. 9, 1977), Gaunt informed the court he was without funds for an attorney and would represent himself at trial. The court explained in detail the risks and hazards of self-representation, especially in a technical jury case of this kind. The court strongly suggested that Gaunt exert every effort to obtain counsel to aid in formulating questions and raising appropriate objections. The court stated that "[If Dr. Gaunt] is, in truth and in fact, a pauper, and if he qualifies for some type of legal aid, then he should bring every effort to seek the same, even at this late date. The Court, however, has not been asked, nor would it were it asked, grant a continuance at this late date in view of the fact that the matter has been going on since 1971, and it is difficult for the Court to conceive that a person with a background of a doctor would not have occasion to make inquiry with respect to possible legal aid." Absent a motion for a continuance to the presiding judge, the court announced it would proceed to the selection of the jury. The court then allowed Dr. Gaunt time to "make a couple of telephone calls" to attempt to obtain some legal counsel.
Gaunt maintains that the court's statements, summarized above, indicate that the court abused its discretion by intimidating him and coercing him to represent himself. We do not agree. In County of San Bernardino v. Doria Mining & Engineering Corp. (1977) 72 Cal. App.3d 776 [140 Cal. Rptr. 383], the court reviewed the policy considerations for California Rules of Court, rule 224,[7] and concluded, at page 781, that there is no policy in this state of indulgence or liberality in favor of a party seeking a continuance. Rather, the party must make a *638 proper showing of good cause in accordance with California Rules of Court, rule 224, section 9 of the Standards of Judicial Administration, and the case law.[8]
Clearly, Gaunt did not meet the requirements of California Rules of Court, rule 224 and section 9. No motion was made "promptly upon the necessity for continuance being ascertained," although Gaunt must have known of his financial inability to pay for counsel at some time prior to the trial date. He waited to raise the matter orally on the date set for trial. He also made no offer of proof or affirmative showing of his financial situation.
The record before us indicates that Gaunt is of at least ordinary intelligence and minimally familiar with court procedure and the applicable case law. The record also indicates that he made no attempt to obtain a continuance from the presiding judge, after the trial court pointed to the proper forum on at least three separate occasions. The record does not support Gaunt's contention that he was coerced into representing himself at trial. As has been noted, "We cannot permit the courts to become a sanctuary for chronic procrastination and irresponsibility on the part of either litigants or their attorneys" (County of San Bernardino, supra, 72 Cal. App.3d, at p. 780; People v. Jackson (1971) 18 Cal. App.3d 504, 509 [95 Cal. Rptr. 919]).
(7) When a litigant is appearing in propria persona, he is entitled to the same, but no greater, consideration than other litigants and attorneys (Monastero v. Los Angeles Transit Co. (1955) 131 Cal. App.2d 156, 160 [280 P.2d 187]; Muller v. Muller (1959) 141 Cal. App.2d 722, 732 [345 P.2d 29]; Doran v. Dreyer (1956) 143 Cal. App.2d 289, 290 [299 P.2d 661]; Sorci v. Crisci (1957) 150 Cal. App.2d 90, 95 [309 P.2d 937]; Taylor v. Bell (1971) 21 Cal. App.3d 1002, 1009 [98 Cal. Rptr. 855]). Further, the in propria persona litigant is held to the same restrictive *639 rules of procedure as an attorney (Monastero, supra, at p. 160).[9]
We turn next to Gaunt's contentions concerning the alleged erroneous admission of certain evidence.
(8) Gaunt first complains of the admission of evidence pertaining to his 1968 arrest and conviction of violating former Health and Safety Code section 26288, a misdemeanor. The record indicates that Gaunt testified that he: 1) did not recall treating Nelson; 2) did not have an office in San Jose in May 1968; 3) did not recall giving silicone injections after 1967; and 4) had become aware only in 1970 that an approved permit was required by federal and state authorities in order to inject silicone. Thus, it became necessary for Nelson to rebut each statement in order to prove that Gaunt had injected her with liquid silicone in 1968 and had done so with knowledge that silicone then was a substance not approved for injection into human tissue.
Preliminarily, we note that pursuant to Evidence Code section 353, "A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless: [¶] (a) There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion.... ." Clearly, Gaunt's failure to object waived the defect (Ng v. Hudson (1977) 75 Cal. App.3d 250, 262-263 [142 Cal. Rptr. 69]; People v. Castaneda (1975) 52 Cal. App.3d 334, 338-339 [125 Cal. Rptr. 9]; People v. Taylor (1973) 30 Cal. App.3d 117, 123 [106 Cal. Rptr. 216]; Russell v. Geis (1967) 251 Cal. App.2d 560, 570 [59 Cal. Rptr. 569]). However, assuming that a proper objection had been made, the evidence was admissible to impeach Gaunt's credibility, and to prove the requisite element of Gaunt's knowledge of the falsity of the representation made that silicone was inert and harmless (Evid. Code, *640 §§ 1101, subd. (b); cf. People v. Reyes (1976) 62 Cal. App.3d 53, 65 [132 Cal. Rptr. 848]).
The record indicates that after Gaunt testified that he did not recall injecting silicone in 1968, portions of his deposition were admitted as follows: In response to a question as to whether he was aware of the law enforcement community's attitude toward silicone between 1967 and 1969, Gaunt replied that silicone was then considered illegal and that he had been arrested for injecting it without a permit. After Gaunt testified that he had first become aware only in 1970 that a permit was required from State Public Health, Nelson's counsel offered the 1968 criminal complaint against Gaunt for violation of former Health and Safety Code section 26288.
The record indicates that the complaint was admitted with paragraph 1 deleted. The court also admonished the jury that any criminal proceedings or arrests were not to be considered by them except for the purpose of impeachment. The court further cautioned that the act of arrest was not a matter for the jury to consider with respect to the merits of the case.
As to the preprobation report, the record indicates that certain portions were stricken on the court's motion, and the jury cautioned again that the document was admitted only for purposes of impeachment. We note that during the in-chambers proceedings on the preprobation report, Gaunt insisted on retaining the portions thereof indicating that only after his arrest did he become aware that the use of silicone was a violation of the law and that he then ceased injecting patients with the substance. As indicated above, Gaunt's testimony was in conflict as to when his arrest and knowledge occurred.
(9) Gaunt also complains that the court erroneously admitted the hearsay testimony of State Public Health Investigator Worley about the dangers of silicone as then reported by other federal agencies. Although he did not object, we note that this information was not hearsay as it was based on a record made by a public employee, and Worley had obtained the information in his official capacity (Evid. Code, § 1280).
(10) However, the court erred in permitting Worley to testify that Gaunt had obtained his silicone from an airline pilot who brought it into the United States as furniture polish. The sources of Gaunt's silicone were not in issue and not relevant. But in our opinion the same *641 result would have been reached by the jury in the absence of this error, and thus it was not prejudicial (Brokopp v. Ford Motor Co. (1977) 71 Cal. App.3d 841, 853 [139 Cal. Rptr. 888, 93 A.L.R.3d 537]).
Gaunt also complains of the admission of the testimony of Ms. Tonelli, his former employee, that in 1967 he told her that silicone injections were unlawful, and that he gave injections to a number of women in 1967 and 1968. Her testimony was admissible to impeach Gaunt's proferred testimony that he did not know until 1968 or 1970 that he was engaged in unlawful activity, and that he gave no silicone injections in 1967 and 1968.
We need not discuss Gaunt's contention concerning the complaint filed by Terry Wright and Gaunt's bankruptcy petition. The record indicates that neither was admitted into evidence nor taken to the jury room.
(11) As to errors in the instructions, Gaunt first complains of the modification of BAJI No. 6.00, set forth below,[10] on the applicable standard of care. Specifically, Gaunt argues that the court erred by deleting the last sentence which refers to the breach of a physician's duty as negligence. The omission was proper as the matter was tried on the more stringent standards applicable to intentional torts, as discussed above.
(12) In his reply brief, Gaunt for the first time argues that the court gave erroneous additional instructions relating to malpractice which confused the jury. New matters cannot be raised for the first time in a reply brief. Further, the record indicates that Gaunt did not object to these instructions or any others below. Thus, we need not discuss in detail his arguments concerning the allegedly erroneous instructions on battery and intentional infliction of emotional distress. He is precluded from raising these matters on appeal. The record also indicates that he *642 consented to all of the instructions given and that he had the informal assistance of counsel in drafting his instructions.
(13) Gaunt next complains that the jury's award of compensatory and exemplary damages was excessive. Our Supreme Court recently summarized the applicable principles of appellate review in Neal v. Farmers Ins. Exchange (1978) 21 Cal.3d 910 [148 Cal. Rptr. 389, 582 P.2d 980]. An appellate court may reverse such an award only when it appears excessive as a matter of law, or where the recovery is so grossly disproportionate as to raise a presumption that it is the result of passion or prejudice. The court stated at page 928: "In making the indicated assessment we are afforded guidance by certain established principles, all of which are grounded in the purpose and function of punitive damages. One factor is the particular nature of the defendant's acts in light of the whole record; clearly, different acts may be of varying degrees of reprehensibility, and the more reprehensible the act, the greater the appropriate punishment, assuming all other factors are equal. [Citations.] Another relevant yardstick is the amount of compensatory damages awarded; in general, even an act of considerable reprehensibility will not be seen to justify a proportionally high amount of punitive damages if the actual harm suffered thereby is small. [Citation.] Also to be considered is the wealth of the particular defendant; obviously, the function of deterrence ... will not be served if the wealth of the defendant allows him to absorb the award with little or no discomfort. [Citations.] By the same token, of course, the function of punitive damages is not served by an award which, in light of the defendant's wealth and the gravity of the particular act, exceeds the level necessary to properly punish and deter." We do not consider the jury award of $450,000 in special and general damages excessive. Nelson adduced evidence of more than $25,000 in special damages. She testified about the disruption in her normal activities and family life.[11] Nelson underwent six surgical procedures with the attendant pain and suffering and recovery periods. The jury determination does not shock our sense of justice, nor raise a presumption that its award was the result of passion or prejudice.
(14) The record also indicates that Nelson's motion to amend her prayer for punitive damages from $1.5 million to $5 million was denied *643 in chambers. The jury awarded $1.5 million in punitive damages. The amount of punitive damages is within the discretion of the jury (Emerson v. J.F. Shea Co. (1978) 76 Cal. App.3d 579 [143 Cal. Rptr. 170]).
(15) Equally without merit is Gaunt's contention that Civil Code section 3294 requires that an inquiry be made of his wealth before punitive damages can be awarded. The courts of this state have consistently held that in determining the amount necessary to impose the appropriate punitive effect, the court is entitled to consider the wealth of the defendant (MacDonald v. Joslyn (1969) 275 Cal. App.2d 282 [79 Cal. Rptr. 707, 35 A.L.R.3d 641]). The object is to make an example as well as a punishment to fit the offense and in determining the amount necessary to impose a punitive effect, the jury may consider the wealth of the defendant (Roemer v. Retail Credit Co. (1975) 44 Cal. App.3d 926 [119 Cal. Rptr. 82]). Thus, no review of a defendant's wealth is mandated before an award of punitive damages can be made.
(16) In evaluating the offense, due consideration must be given to the importance of the public policy, the violation of which was the basis of the plaintiff's claim and the magnitude of the defendant's violation of such policy (Zhadan v. Downtown L.A. Motors (1976) 66 Cal. App.3d 481, 497 [136 Cal. Rptr. 132]). In the instant matter, both the federal and state authorities had established a careful policy to protect the public from dangerous drugs. Any substance for introduction into the human body had to be extensively tested and retested before it received approval. Liquid silicone was a substance that had not met the safety requirements, and its use, therefore, was severely restricted and required a permit. Gaunt's knowing violation of these restrictions constituted a flagrant disregard of public policy, as well as a violation of his fiduciary duties.
As this court recently reiterated, when a fiduciary relationship exists and the defendant abuses the confidence of the plaintiff, both law and equity have a most tender regard for the rights of the complaining party (Werschkull v. United California Bank (1978) 85 Cal. App.3d 981, 1004 [149 Cal. Rptr. 829]). As we discussed above, the jury here determined that the fiduciary physician-patient relationship had been breached by Gaunt's fraud. (17) An action for fraud will support an award of punitive damages (Alhino v. Starr (1980) 112 Cal. App.3d 158, 178 [169 Cal. Rptr. 136]).
*644 (18) Although exemplary damages must bear a reasonable relation to actual damages, no fixed mathematical ratio can be defined (Wyatt v. Union Mortgage Co. (1979) 24 Cal.3d 773, 790 [157 Cal. Rptr. 392, 598 P.2d 45]). The amount of punitive damages is within the discretion of the jury (Emerson v. J.F. Shea Co., supra, 76 Cal. App.3d 579). Accordingly, we see no need to modify either the compensatory or punitive damage awards.
Finally, we turn to Gaunt's contention that the misconduct of Nelson's counsel deprived him of a fair trial. Specifically, he points to allegedly insulting and insinuating statements made in opening and closing arguments that referred to him as a "monster" and a "lying animal." The record indicates that in the closing argument, Nelson's attorney suggested that it was unfortunate that the jury could not send Gaunt to prison as Gaunt was criminally indifferent to the rights of others and should be punished, and referred to Gaunt as "Dr. Malpractice."
(19) While the record indicates that Nelson's counsel was guilty of misconduct that may have been prejudicial (cf. Stone v. Foster, supra, 106 Cal. App.3d 334, 353-355), in view of Gaunt's failure to object and preserve the issue on appeal, we need not reach it on the merits. In a civil case, a claim of misconduct is entitled to no consideration on appeal unless the record shows a timely and proper objection and a request that the jury be admonished. "In the absence of a timely objection the offended party is deemed to have waived the claim of error through his participation in the atmosphere which produced the claim of prejudice" (Horn v. Atchison T. & S.F. Ry. Co. (1964) 61 Cal.2d 602, 610 [39 Cal. Rptr. 721, 394 P.2d 561]). As stated in Sabella v. Southern Pac. Co. (1969) 70 Cal.2d 311, 320 [74 Cal. Rptr. 534, 449 P.2d 750], the procedure for raising proper objection is "not a meaningless ritual; it has been designed through judicial experience to prevent by timely words of caution the very problem with which we are here concerned."
Gaunt argues that the trial court abused its discretion by failing to intercede to prevent potentially prejudicial misconduct of opposing counsel. The record does not support his contention. The trial court here was faced with a dilemma after Gaunt insisted in proceeding in pro. per. Accordingly, the court asked and received the cooperation of Nelson's counsel. The court, Gaunt and Nelson's counsel met each day prior to the seating of the jury to discuss anticipated testimony and evidence, *645 and any objections that might be appropriate. On several occasions, the court, in the presence of the jury, reiterated the proper procedure for admission of evidence, and suggested that if Gaunt wished to raise an objection he might do so. On the court's initiative, several admonitions were given to the jury to disregard statements made by witnesses. The court reminded Gaunt several times that if it were to take any further affirmative steps on his behalf, it might be construed as judicial advocacy.
After a review of the record, we cannot agree that a reversal is required. While we cannot condone the behavior of Nelson's counsel, we also cannot ignore the established rules of procedure. As we have indicated above, Gaunt was not entitled to privilege and indulgence not accorded to defendants who are represented by counsel (Oliver v. Superior Court (1961) 197 Cal. App.2d 237, 240 [17 Cal. Rptr. 474]). "[P]unishment of counsel to the detriment of his client is not the function of the court. [Citation.] Intemperate and unprofessional conduct by counsel as is here involved runs a grave and unjustifiable risk of sacrificing an otherwise sound case for recovery, and as such is a disservice to a litigant" (Sabella v. Southern Pac. Co., supra, 70 Cal.2d 311, 321).
The purported appeal from the verdict is dismissed. The judgment is affirmed.
Miller, J., and Smith, J., concurred.
NOTES
[1] Gaunt's notice of appeal, filed in pro. per., erroneously states that he appeals from the verdict and notice of entry of judgment. We construe the latter as taken from the judgment and dismiss the purported appeal from the verdict.
[2] The former statute (Stats. 1963, ch. 1958, § 9), so far as pertinent, provided that use of a new drug was unlawful unless there had been approval by FDA or by compliance with the state procedures.
[3] The statute, added by Statutes of 1970, chapter 360, section 1, then provided: "In an action for injury or death against a physician or surgeon, dentist, registered nurse, dispensing optician, optometrist, registered physical therapist, podiatrist, licensed psychologist, osteopath, chiropractor, clinical laboratory bioanalyst, clinical laboratory technologist, veterinarian, or a licensed hospital as the employer of any such person, based upon such person's alleged professional negligence, or for rendering professional services without consent, or for error or omission in such person's practice, four years after the date of injury or one year after the plaintiff discovers, or through the use of reasonable diligence should have discovered, the injury, whichever first occurs. This time limitation shall be tolled for any period during which such person has failed to disclose any act, error, or omission upon which such action is based and which is known or through the use of reasonable diligence should have been known to him."
[4] Code of Civil Procedure section 338 provided a three-year period and, so far as pertinent, read: "Within three years: ... [¶] 4. An action for relief on the ground of fraud or mistake. The cause of action in such case not to be deemed to have accrued until the discovery, by the aggrieved party, of the facts constituting the fraud or mistake." (Italics added.)
[5] Kessenick & Mankin, Medical Malpractice: The Right To Be Informed (1973) 8 U.S.F.L.Rev. 261, 262-265.
[6] We note that no court has reached the question of liability where, as here, the elements of fraud were established (cf. Stone v. Foster (1980) 106 Cal. App.3d 334, 353 [164 Cal. Rptr. 901]). The 1975 amendments to Code of Civil Procedure section 340.5, which narrowly define professional negligence, indicate that the Legislature attempted to curb fraud by health care providers by another route.
[7] Rule 224 provides: "Motions for continuances before trial in civil cases shall be made to the judge supervising the master calendar or, if there be no master calendar, to the judge in whose department the case is pending. Except for good cause, such motion shall be made on written notice to all other parties. The notice shall be given and motion made promptly upon the necessity for the continuance being ascertained. No continuance before or during trial in civil cases shall be granted except upon an affirmative showing of good cause therefor. This rule shall not prevent cases from being dropped from the calendar by stipulation or order."
[8] Section 9 provides in pertinent part: "To insure the prompt disposition of civil cases, each superior court should: ... [¶] (b) Adopt a firm policy regarding continuances, emphasizing that the dates assigned for a trial setting or pretrial conference, a settlement conference and for trial must be regarded by counsel as definite court appointments. Any continuance, whether contested or uncontested or stipulated to by the parties, should be applied for by noticed motion, with supporting declarations, to be heard only by the presiding judge or by a judge designated by him. No continuance otherwise requested should be granted except in emergencies. A continuance should be granted only upon an affirmative showing of good cause...." (See County of San Bernardino, supra, p. 779.)
[9] On the day set for oral argument, September 15, 1981, Gaunt filed a substitution of counsel and filed a motion seeking postponement of the oral argument for about six months to permit his new counsel to review the record, etc. Our records indicate that: 1) on September 23, 1980, Gaunt filed substitution of counsel indicating that he was again in pro. per. and had dismissed the counsel who had prepared and filed closing briefs on this appeal; and 2) Gaunt was mailed a notice of the date of oral argument on August 14, 1981. We deferred submission of the matter pending determination of Gaunt's motion. As we see his action as a continuation of his pattern of obtaining and dismissing counsel and then seeking last-minute continuances without an offer of proof we denied his motion for the reasons stated above.
[10] "In performing professional services for a patient, a physician or surgeon has the duty to have that degree of learning and skill ordinarily possessed by physicians and surgeons of good standing, practicing in the same or a similar locality and under similar circumstances.

"It is his further duty to use the care and skill ordinarily exercised in like cases by reputable members of his profession practicing in the same or a similar locality under similar circumstances, and to use reasonable diligence and his best judgment in the exercise of his skill and the application of his learning, in an effort to accomplish the purpose for which he is employed."
[11] The record indicates that no claim was presented for loss of consortium by Nelson's husband. We note that an appellate court recently refused to alter a jury verdict which included $500,000 for loss of consortium alone (Rodriguez v. McDonnell Douglas Corp. (1978) 87 Cal. App.3d 626, 654 [151 Cal. Rptr. 399]).