**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

RICHARD ALAN MORAN; ERNEST
FAZIO,
                                    *Plaintiffs,*

            and

MIKE COLBERN, individually and on
behalf of all similarly situated
retired Major League Baseball
Players,
                        *Plaintiff-Appellant,*

            v.

ALLAN H. SELIG, aka "BUD" Selig,
as Commissioner of Major League          No. 04-55647
Baseball; NEW YORK YANKEES               D.C. No.
BASEBALL CLUB, an entity of              CV-03-07424-R
unknown form; ATLANTA BRAVES,
INC., a Delaware Corporation;            OPINION
DETROIT TIGERS, INC., a Michigan
Corporation; ST. LOUIS CARDINAL
BASEBALL CLUB, an entity of
unknown form; BOSTON RED SOX
BASEBALL CLUB, an entity of
unknown form; FLORIDA MARLINS
BASEBALL CLUB, an entity of
unknown form; ANAHEIM ANGELS
LP, a California limited
partnership; ARIZONA
DIAMONDBACKS BASEBALL CLUB,
an entity of unknown form;

BALTIMORE ORIOLES, INC., a
Maryland Corporation; CHICAGO
CUBS, INC., an Illinois Corporation;
CHICAGO WHITE SOX BASEBALL
CLUB, an entity of unknown form;
CINCINNATI REDS BASEBALL CLUB,
an entity of unknown form;
CLEVELAND INDIANS BASEBALL
COMPANY, INC., an Ohio
Corporation; COLORADO ROCKIES
BASEBALL CLUB, an entity of
unknown form; HOUSTON ASTROS
BASEBALL CLUB, an entity of
unknown form; KANSAS CITY
ROYALS BASEBALL CORPORATION, a
Missouri Corporation; LOS
ANGELES DODGERS, INC., a
Delaware Corporation; MILWAUKEE
BREWERS BASEBALL CLUB, INC., a
Wisconsin Corporation; MINNESOTA
TWINS BASEBALL CLUB, an entity of
unknown form; MONTREAL EXPOS
BASEBALL CLUB, an entity of
unknown form; NEW YORK METS
BASEBALL CLUB, an entity of
unknown form; THE PHILLIES, a
Pennsylvania limited Partnership;
PITTSBURGH PIRATES, INC., a
Pennsylvania Corporation; SAN
DIEGO PADRES BASEBALL CLUB, an
entity of unknown form; SAN
FRANCISCO GIANTS ENTERPRISES

LLC, a Delaware limited liability
company; SEATTLE MARINERS
BASEBALL CLUB, an entity of
unknown form; TAMPA BAY DEVIL
RAYS BASEBALL CLUB, an entity of
unknown form; TEXAS RANGERS
BASEBALL CLUB, an entity of
unknown form; OAKLAND
ATHLETICS LIMITED PARTNERSHIP, a
Delaware Limited Partnership;
TORONTO BLUE JAYS BASEBALL
CLUB, an entity of unknown form,
                    *Defendants-Appellees.*

Appeal from the United States District Court
for the Central District of California
Manuel L. Real, District Judge, Presiding

Argued and Submitted
December 6, 2005—Pasadena, California

Filed May 9, 2006

Before: Stephen Reinhardt and Johnnie B. Rawlinson,
Circuit Judges, and Jeremy D. Fogel,* District Judge.

Opinion by Judge Reinhardt

---

*The Honorable Jeremy D. Fogel, United States District Judge for the
Northern District of California, sitting by designation.

## COUNSEL

Gerald M. Serlin (argued), Douglas G. Benedon, Benedon & Serlin, Woodland Hills, California; John R. DaCorsi, Jason L. Rumsey, DaCorsi & Placensio, Woodland Hills, California, for the plaintiffs-appellants.

Howard Ganz (argued), Lary Alan Rapaport, Proskauer Rose LLP, Los Angeles, California, for the defendants-appellees.

## OPINION

REINHARDT, Circuit Judge:

Appellants seek reversal of the district court's grant of summary judgment on their Title VII and battery claims. We conclude that they have failed to make a prima facie showing

of discrimination under Title VII, and to offer evidence of the commission of a battery sufficient to survive summary judgment. With respect to the Title VII claim, we hold in the alternative that appellees had a legitimate non-discriminatory reason for the actions they took and that such reason was non-pretextual. Accordingly, we affirm.

I.

In October 2003, Mike Colbern, a retired Major League Baseball player,[1] brought a class action on behalf of himself and other retired baseball players against Major League Baseball ("MLB")[2] claiming, in pertinent part, that MLB had (1) violated Title VII by excluding them from medical and supplemental income plans devised by MLB for former Negro League players, and (2) committed battery by subjecting them to a dangerous regimen of cortisone shots and other drugs without their informed consent. Appellants are virtually all Caucasian[3] former MLB players who played in the Major Leagues for less than four years between 1947 and 1979 and were accordingly denied MLB pension and medical benefits.[4]

Until 1947, when Jackie Robinson broke the color barrier in the Major Leagues, African-Americans were not allowed to

---

[1]Colbern played for the Chicago White Sox in 1978 and 1979.

[2]MLB commissioner Allan "Bud" Selig and all existing MLB teams were also named as defendants in the suit. References to "MLB" should be understood to encompass the league as a whole and its various teams.

[3]Although a few of the class members are Latino, according to the Plaintiffs-Appellants' complaint, "[t]he overwhelming majority (99%) of members of the Class are Caucasian . . . ."

[4]Between 1947 and 1979, MLB players became vested in their medical and pension plans after four or five years of service in MLB. Some plaintiffs missed the vesting requirement by a matter of days. After a strike by MLB players in 1981, the vesting requirement for MLB medical benefits was reduced to one day; the vesting requirement for an MLB pension was reduced to 43 days. These vesting requirements were not extended to players who had ended their careers prior to 1980.

play Major League Baseball and could play only in the so-called "Negro Leagues," associations of professional baseball clubs composed exclusively of black players. These clubs terminated all operations in the early 1960s as a result of the absorption of African-Americans into MLB, and the Negro Leagues ceased to exist. With the coming of racial integration to baseball, the market for a separate league for minority players evaporated. Having lost their economic base, the former Negro Leagues were unable to offer any pension or medical benefits to their former players. In the 1990s, seeking to make partial amends for its exclusion of African-Americans prior to 1947, MLB voluntarily decided to provide certain benefits to former Negro League players.[5] In 1993, MLB created a plan that provided medical coverage to former Negro League players ("Negro League Medical Plan"). In 1997, it adopted a supplemental income plan that provided an annual payment of $10,000 to eligible players ("Negro League Supplemental Income Plan"). Individuals who had played in the Negro Leagues prior to 1948, i.e., prior to African-Americans being allowed in the Major Leagues, were eligible for such payments.[6] (For ease of reference, these two plans are referred to collectively as the "Negro League Plans.") Some of the eligible players had subsequently played in the Major Leagues for a period of time too short to qualify them for MLB's regular medical and pension plans and some had never played in the Major Leagues at all.

On August 4, 2003, appellants filed a complaint with the Equal Employment Opportunity Commission (EEOC) charging that, in violation of Title VII, MLB had arbitrarily, inten-

---

[5]There is no suggestion that MLB and the Negro Leagues were connected in any way, legally or otherwise.

[6]Also in 1997, MLB created a similar pension plan for former MLB players whose careers had ended prior to 1947 — i.e., before pensions were instituted in MLB. By virtue of the fact that African-Americans were excluded from MLB prior to 1947, no African-American could benefit from this plan.

tionally and unlawfully excluded them from the Negro League Plans on the basis of their race. The EEOC issued appellants a right-to-sue letter on August 23, 2003, and appellants brought suit in federal district court on October 16, 2003, joining the Title VII charge with intentional battery, negligence, § 1981 and § 1985 claims. The intentional battery and negligence claims were wholly unrelated to any racial question but, instead, contained allegations that MLB team doctors and trainers had injected appellants with multiple cortisone shots and administered other drugs to them over the course of their careers and had deliberately failed to inform them of the potential risks associated with such treatment.

In response to appellants' complaint, the defendants filed a motion to dismiss and/or for summary judgment on January 30, 2004. On March 15, 2004, the district court held a hearing on the motion for summary judgment. At that hearing, the appellants withdrew their negligence, § 1981, and § 1985 claims. After hearing arguments on the remaining Title VII and battery claims, the district court granted defendants' motion for summary judgment, concluding that there were no genuine issues as to any material facts and that defendants were entitled to judgment as a matter of law. Appellants timely appealed, contending that the district court erred in granting summary judgment as to both the Title VII claim and the battery claim. We have jurisdiction over the appeal under 28 U.S.C. § 1291.

## II.

We review the district court's grant of summary judgment *de novo*. *See Buono v. Norton*, 371 F.3d 543, 545 (9th Cir. 2004). Our review is governed by the same standard used by the trial court under Federal Rule of Civil Procedure 56(c). *See Suzuki Motor Corp. v. Consumer Union of United States, Inc.*, 330 F.3d 1110, 1131 (9th Cir. 2003). In reviewing a grant of summary judgment, "[w]e must determine, viewing the evidence in the light most favorable to . . . the non-moving

party, whether there are any genuine issues of material fact and whether the district court correctly applied the substantive law." *Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir. 2004) (citation omitted). "We are not to weigh the evidence or determine the truth of the matter, but only to determine whether there is a genuine issue for trial." *Abdul-Jabbar v. Gen. Motors Corp.*, 85 F.3d 407, 410 (9th Cir. 1996) (citation omitted).

### III.

**[1]** Appellants contend that MLB's provision of medical and supplemental income benefits to certain African-Americans, former Negro League players who played in the Major Leagues between 1947-1979 for too short a period to vest in the MLB medical and pension benefits plans — but not to them — constitutes unlawful discrimination on the basis of race. Specifically, they allege disparate treatment in the provision of these benefits in violation of Title VII. To survive summary judgment on their Title VII claim, appellants must first make a prima facie case of such treatment. In order to do so, appellants must show that: (1) they belonged to a protected class; (2) they were qualified for their jobs; (3) they were subjected to an adverse employment action; and (4) similarly situated employees not in their protected class received more favorable treatment. *See Kang v. U. Lim Am., Inc.*, 296 F.3d 810, 818 (9th Cir. 2002). Appellants meet the first two criteria, which are not in dispute.[7] They cannot satisfy the latter two criteria, however, and thus we affirm the district court's grant of summary judgment as to their Title VII claim.[8] *See Leong v. Potter*, 347 F.3d 1117, 1125 (9th Cir.

---

[7]Title VII applies to all racial groups, whether majority or minority. *See McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 278-80 (1976).

[8]Appellees argue that appellants' Title VII claim is barred by the statute of limitations. The district court questioned the parties' counsel about this issue, but ultimately did not rule on it. Although we think it likely that appellees are correct on this point, we see no need to reach the statute of limitations issue because we agree with the district court's decision on the merits of the claim. *See infra* Part III.

2003) (holding that the district court properly granted summary judgment where plaintiff could not demonstrate a prima facie case of discrimination). Alternatively, we hold that MLB had a legitimate non-discriminatory reason for adopting the two benefit plans, a reason that was non-pretextual.

## A.

**[2]** The alleged adverse employment action on which appellants base their Title VII claim is MLB's failure to provide them with the same medical and supplemental income benefits that it provides to former Negro League players who, like appellants, served in the Major Leagues during the 1947-1979 period but did not play long enough to vest under the MLB benefits programs in effect at the time. Appellants are correct that Title VII's prohibition on discrimination in the "terms, conditions, or privileges of employment" encompasses certain "benefits that [an employer] is under no obligation to furnish by any express or implied contract." *Hishon v. King & Spalding*, 467 U.S. 69, 75 (1984) (internal quotation marks omitted) ("[A] benefit, though not a contractual *right* of employment, may qualify as a '[privilege]' of employment under Title VII." (second alteration in original)). In certain circumstances, voluntary medical or pension programs can be benefits, the provision of which must comply with Title VII. Appellants are incorrect, however, in their assertion that MLB's Negro League Plans constitute such benefits. As *Hishon*, the governing case in this area, and other related cases make clear, employers' provision of benefits that they are under no obligation to provide can give rise to a disparate treatment claim under Title VII, but only if the benefits are awarded *on the basis of an employment relationship. See Hishon*, 467 U.S. at 75 (describing benefits that constitute "privileges of employment" — and thus are subject to Title VII — as those that are "part and parcel of the employment relationship" or "comprise the 'incidents of employment' "); *see also Judie v. Hamilton*, 872 F.2d 919, 921 (9th Cir. 1989) (describing the benefit that is a "privilege of employment"

subject to Title VII as "part and parcel of a[n employee's] job").

**[3]** Although some beneficiaries of the two Negro League Plans may have played MLB baseball for a relatively short period of time, eligibility for benefits is not based on such former employment with MLB or on any employment relationship between MLB and the recipients. Rather, to qualify for the Negro League Plans, a recipient need not be a former MLB player, only a former Negro League player. A former Negro League player who never played for an MLB team is eligible for the benefits even though he was never employed in any way by MLB or one of its clubs.[9] Thus, although they resemble benefits typically conferred on the basis of an employment relationship, the Negro League Plans' benefits are not "part and parcel of the employment relationship" between recipients and MLB nor are they "incidents of employment" of the recipient by MLB.[10] Because the supple-

---

[9]Under the Negro League Supplemental Income Plan, a player must have played at least one season in the Negro Leagues in a calendar year prior to 1948 and must have played all or a portion of four total seasons of professional baseball, whether in the Negro Leagues, the Major Leagues, or both. Recipients can thus satisfy the longevity requirement of the Supplemental Income Plan, in part, through service in MLB. However, this does not mean that the supplemental income benefits are awarded based on an employment relationship between the recipients and MLB because the *basis* for the award is having played in the Negro Leagues. A player *cannot* receive the benefits if he never played in the Negro Leagues and, conversely, a player *can* receive the benefits if he never played in the Major Leagues (i.e., if he played all four of his qualifying seasons in the Negro Leagues).

[10]Appellees are correct when they argue that "while assuming the form of benefit plans for the purposes of administration, the payments made by MLB to these former Negro League players to help defray certain of their medical expenses and to furnish them with a modest annual stipend are, in essence, charitable contributions — nothing more, and nothing less." Equally correct, however, would be the characterization of the payments as conscience money or guilt payments to make up for years of invidious discrimination on the part of the owners of the Major League ball clubs that historically monopolized America's favorite pastime.

mental income payments and medical benefits MLB provides to former Negro League players are not awarded on the basis of an employment relationship with MLB, but rather on the basis of participation in another entity to which MLB had no legal relationship, the receipt of these benefits cannot give rise to a valid Title VII claim. In other words, the fact that the appellants do not receive the same or substantially similar benefits as those provided under the Negro League Plans cannot be considered an "adverse employment action" because the provision of these benefits by the MLB is not an "employment action" at all. Appellants therefore cannot satisfy the critical third prong for making a prima facie case under Title VII.

## B.

[4] Similarly, in determining whether summary judgment is appropriate, we may assess independently the question whether the former players receiving the benefits are similarly situated to appellants. In order to show that the "employees" allegedly receiving more favorable treatment are similarly situated (the fourth element necessary to establish a prima facie case under Title VII), the individuals seeking relief must demonstrate, at the least, that they are similarly situated to those employees in all material respects. *See Aragon v. Republic Silver State Disposal, Inc.*, 292 F.3d 654, 660 (9th Cir. 2002) (citing with approval the Second Circuit's opinion in *McGuinness v. Lincoln Hall*, 263 F.3d 49, 53-54 (2d Cir. 2001) — which stated that "similarly situated" means that employees must "be similarly situated in all material respects" — as "explaining [the] minimal showing necessary to establish coworkers were similarly situated"); *see also Ercegovich v. Goodyear Tire & Rubber Co*., 154 F.3d 344, 352 (6th Cir. 1998) (holding that "the plaintiff must show that the 'comparables' are similarly-situated in all respects" (citation and internal quotation marks omitted)); *Lynn v. Deaconess Med. Center-West Campus*, 160 F.3d 484, 487 (8th Cir. 1998) (requiring that employees be "similarly situated in all relevant

respects" (citation and internal quotation marks omitted)). Appellants have failed to demonstrate they are similarly situated in all material respects to the former Negro League players they assert are receiving more favorable treatment, and thus they cannot establish a prima facie case of discrimination under Title VII.

[5] Appellants argue that they are similarly situated to — but treated less favorably than — the former Negro League players who also played in the Major Leagues between 1947-1979 but receive medical and supplemental income benefits under the Negro League Plans despite, like appellants, having served in the Major Leagues for too short a period to meet the vesting requirements in effect at the time for the MLB medical and pension plans. Although there are indeed some similarities between appellants' circumstances and that of the players to whom they compare themselves, the two groups are not similar in "all material respects." Unlike the beneficiaries of the Negro League Plans, appellants were never prevented from playing for a MLB team, and thus unable to acquire the necessary longevity, for reasons entirely independent of their ability to do the job (i.e., on account of their race). Nor did appellants ever play in the Negro Leagues, a primary requirement for eligibility under the Negro League Plans.

[6] MLB's absolute ban on African-American players before 1947 impeded those players from accumulating the necessary years of service in the Major Leagues to qualify for the medical and pension benefits under the terms of the MLB benefits plans in effect at the time.[11] For instance, an African-American baseball player who had the ability to play five

_____

[11]Moreover, as appellees point out, "if anything, plaintiffs were *advantaged* by the pre-1947 exclusion and allegedly [sic] sluggish integration of African-American athletes, because plaintiffs had fewer competitors for roster spots on MLB Clubs," which made it easier for them to acquire the necessary longevity to qualify for the MLB benefits plan in effect at the time.

years of baseball at the professional level in the 1945-1950 period would have been able to play only three seasons on a MLB team as a result of the pre-1947 ban (the other two years would have been spent in the Negro Leagues) and thus would not have been able to qualify for the MLB medical and pension plans under the terms in effect at the time, whereas a white player equal in all respects would have been able to play all five years on a MLB team and thus could have qualified for the medical and pension plans.[12] Indeed, the motivation for MLB's creation of the Negro League Plans was this fundamental difference in the ability of white and African-American players who began their careers before 1947 to accumulate the necessary playing years to vest in the MLB medical and pension plans.[13] As a basic matter, in order to

---

[12]Under the Negro League Supplemental Income Plan, an individual is eligible if he played all or a portion of a season in the Negro Leagues in a calendar year before 1948 and if he played all or a portion of a playing season for at least four calendar years in the Negro Leagues, Major Leagues, or a combination of the two. In other words, a former Negro League player still had to play a total of four seasons of professional baseball in order to qualify for the supplemental income benefits.

Unlike the Negro League Supplemental Income Plan, the Negro League Medical Plan fails to specify that former Negro League players must have played in the Negro Leagues prior to 1948 and instead requires only that an individual be a former Negro League player. Although it could be argued that an African-American who played in the Negro Leagues only after 1948 would be more similarly situated to appellants, we would still find appellants to be differently situated given the structural discrimination that gave rise to the very existence of the Negro Leagues. In appellants' own words, "the racist culture that permeated baseball from the 1940's through [the] early 1970's" led to an "unwritten quota of two black players per [MLB] team" after the color barrier was broken, and those two players were "[u]sually . . . of outstanding talent." Appellants do not provide an example of any such player (i.e., one who played in the Negro Leagues only after 1948 and who received benefits under the Plans). Further, because the benefits provided under the Plans are not based on an employment relationship, *see supra*, we would hold the appellants' Title VII claim to be without merit regardless.

[13]Notably, for those white players who, by virtue of when they played in the Major Leagues, could not have qualified for pension benefits (i.e.,

qualify for the benefits under the Negro League Plans, the players to whom the appellants seek to equate themselves must have played in the Negro Leagues — a qualification that the appellants indisputably lack. As a result, the appellants are not similarly situated *in all material respects* to former Negro League players who also played in the Major Leagues during the 1947-1979 period and now receive medical and supplemental income benefits despite not having played for four or five years for an MLB team.[14] Therefore, appellants have also failed to satisfy the fourth criterion for establishing a prima facie case under Title VII, which in itself warrants the grant of summary judgment in favor of MLB.

## C.

**[7]** In the alternative, we hold that MLB had a legitimate, non-discriminatory and non-pretextual reason for awarding the pension and medical benefits to African-American players who qualified under the Plans, and not to appellants. That in itself would support the grant of summary judgment. *See Leong*, 347 F.3d at 1124 ("If the plaintiff [in a Title VII case] establishes a prima facie case, the burden of production shifts

those players whose careers ended prior to 1947, before any MLB pension plan existed), MLB created supplemental income benefits that are identical to those provided by the Negro League Supplemental Income Plan for individuals who played in the Negro Leagues during the same period.

[14]Instead, appellants are similarly situated in all material respects to another group of African-American players: those who (1) had played in the Major Leagues during the same period of time as the appellants (1947-1979), (2) did not play long enough to qualify for medical or pension benefits under the terms of the MLB benefits plans of the time, and (3) did not play in the Negro Leagues. If such African-American players had received medical and pension benefits from MLB, then the appellants might be able to make a prima facie case of discrimination. The appellants have identified no such players. Rather, they rest their Title VII claim on a comparison to players whose situation differs in at least two material respects — the inability of those players to play for an MLB team in the pre-1947 period and the actual playing time those players experienced in the Negro Leagues.

to the employer to articulate a legitimate, nondiscriminatory reason for the [adverse] employment decision. . . . If the employer offers a nondiscriminatory reason, the burden returns to the plaintiff to show that the articulated reason is a pretext for discrimination.").

[8] The Negro League Plans were created to remedy specific discrimination that directly affected identifiable individuals and to compensate those individuals for injuries caused by that discrimination, specifically, for the loss of benefits by African-American baseball players — a loss that resulted from their inability to acquire the necessary years of playing time to qualify for MLB's pension and medical benefits. The decision to provide benefits under the Negro League Plans only to individuals, all African-Americans, who were injured by MLB's policy of excluding members of their race from playing MLB baseball does not discriminate against Caucasians. Not only were Caucasians the beneficiaries of the discriminatory policy; they had every opportunity under it to acquire eligibility for the MLB benefits. Appellants were never the victims of discrimination and were never deprived, during any portion of their playing years, of an opportunity to acquire the longevity necessary to become eligible for MLB benefits; rather, they simply failed to do so. Although the players who qualify under the Negro League Plans are all African-American, it was African-Americans and not Caucasians who were discriminated against on the basis of their race. It is true that only players who played in the Negro Leagues are eligible to receive benefits under the Plans. It is also true, however, that the Negro Leagues were formed to provide the opportunity to play professional baseball to those who were otherwise excluded because of their race. There is no evidence, and it would strain credulity and one's sense of history, to suggest that appellants or any other Caucasians sought entry to the Negro Leagues or would have been willing to play baseball in that forum. In short, the Plans were adopted for the specific purpose of providing benefits to those who had been discriminated against by being denied the

opportunity to play MLB baseball and to qualify for MLB benefits.

**[9]** To the extent that MLB sought to remedy in part its past discriminatory conduct, it acted honorably and decently and not out of an improper or invidious motive. MLB has thus shown a legitimate, non-discriminatory reason for its decision to provide benefits to former Negro League Players, a reason that is not pretextual in any respect. *Cf. Davis v. San Francisco*, 890 F.2d 1438, 1448-49 (9th Cir. 1989) (holding that Title VII was not violated when consent decree mandated affirmative relief to remedy past discrimination against minority firefighters); *Higgins v. Vallejo*, 823 F.2d 351, 355-56 (9th Cir. 1987) (holding that Title VII was not violated when a black firefighter was promoted over a white firefighter pursuant to an affirmative action plan designed to remedy past discrimination). Because providing a remedy for past discrimination only to those who have been discriminated against does not constitute discriminatory conduct, and because MLB's reasons for adopting the remedial benefit plans were straightforward and not pretextual, any prima facie case of discrimination appellants might have established would be adequately rebutted by appellees, and summary judgment would in any event be appropriate.

## D.

**[10]** Because we conclude that appellants are unable to establish a prima facie case of disparate treatment, and that any such showing would in any event be rebutted by appellees' demonstration of a non-discriminatory, non-pretextual reason for their actions, we hold that their Title VII claim cannot survive summary judgment, and affirm the district court's denial of that claim.

## IV.

In addition to their Title VII claim, appellants contend that MLB team doctors and trainers committed battery by inject-

ing them with multiple cortisone shots and administering other drugs to them over the course of their careers without their informed consent. We affirm the district court's grant of summary judgment as to appellants' battery claim because appellants have failed to show the type of intent necessary to vitiate consent.

[11] The appellants' battery claim is governed by California law. In *Cobbs v. Grant*, 502 P.2d 1 (Cal. 1972), the California Supreme Court addressed the issue whether the lack of informed consent to a medical procedure gives rise to a negligence or battery claim for injuries that result from that procedure. *Id.* at 8. The *Cobbs* court stated that:

> The battery theory should be reserved for those circumstances when a doctor performs an operation to which the patient has not consented. When the patient gives permission to perform one type of treatment and the doctor performs another, the requisite element of deliberate intent to deviate from the consent is present. However, when the patient consents to certain treatment and the doctor performs that treatment but an undisclosed inherent complication *with a low probability occurs*, no intentional deviation from the consent given appears; rather, the doctor in obtaining consent may have failed to meet his due care duty to disclose pertinent information. In that situation the action should be pleaded in negligence.

*Id.* (emphasis added).

In contrast with *Cobbs*, the California Court of Appeal, in *Nelson v. Grant*, 125 Cal. App. 3d 623 (1981), upheld the trial court's finding that the defendant-physician was liable for battery. *Id.* at 628. There, the defendant-physician injected the plaintiff with what he described to the patient as a safe and "inert substance" that "would have 'absolutely no side

effects.' " *Id.* at 629. The substance was in fact silicone, which at the time was considered dangerous and was highly regulated. *Id.* at 629-30. Further, the defendant-physician knew that his use of silicone was illegal. *Id.* at 635. Citing *Cobbs*, the court distinguished the facts in the case before it from those that *Cobbs* explained merely give rise to a claim of negligence, noting that "a physician's failure to disclose a remote risk requires that the action sound in negligence." *Id.* at 634. The *Nelson* court then concluded that because the defendant-physician had "provided Nelson with false and misleading information and knowingly concealed information that was material to the cause of [her] injuries[,] . . . the procedure to which Nelson consented was substantially different from that which was performed and sufficiently different to amount to a battery." *Id.* at 635.

**[12]** California courts have thus held that when a patient is affirmatively misled and consents to a procedure that is "substantially different" from that which was performed, such a procedure may amount to a battery.[15] *Id.* They have also held that a doctor's failure to disclose "pertinent information" about a treatment with a *low probability* of complications is a claim that sounds only in negligence. *Cobbs*, 502 P.2d at 8 (emphasis added). California courts have not decided, however, whether a doctor's deliberate failure to disclose the known risks of a procedure with a high or even medium probability of complications would constitute a battery. We need not decide here, however, whether such a failure would constitute a battery under California law because appellants have failed to introduce sworn evidence giving rise to a genuine issue of material fact as to whether the team doctors and trainers were aware of any such risk or indeed whether there was in fact more than "a low probability of complications."

---

[15]Emphasizing that "battery is an intentional tort," the *Nelson* court stated that it "should be reserved for those circumstances where a doctor performs an operation to which the patient has not consented." *Id.* at 634. It also stated, however, that "*Cobbs* implies that the failure to discuss the nature of the treatment sounds in battery." *Id.*

**[13]** Appellants' declarations, which were submitted by several class members, allege only that the individual declarants were "administered cortisone shots and other drugs" and were never "informed . . . of [the] risks associated with cortisone shots," that they "felt [they] had no choice but to accept the shots or lose [their] job playing baseball," and that they later experienced health problems that they attributed to the cortisone injections. There is no declaration or other sworn evidence in the record to the effect that the team doctors or trainers had knowledge that there were substantial risks to the treatment they administered, that they deliberately withheld such information from appellants, or that the consent obtained was for a treatment "substantially different" from that which was ultimately administered.

Although the complaint alleges in general terms that the team doctors and trainers knew of the "serious side effects directly correlated to excessive exposure to cortisone injection" and that the health risks involved were "purposefully withheld" from plaintiffs, the complaint in this case cannot be considered as evidence at the summary judgment stage because it is unverified.[16] *See Schroeder v. McDonald*, 55 F.3d 454, 460 & nn. 10-11 (9th Cir. 1995); *Lew v. Kona Hospital*, 754 F.2d 1420, 1423-24 (9th Cir. 1985).

**[14]** Appellants have failed to present under oath specific facts demonstrating that the procedure performed was different than that to which they consented, that the doctors knew of substantial risks and failed to disclose or deliberately withheld such material information, or that appellants were deprived of the opportunity to provide informed consent.

---

[16]In contrast, a verified complaint may serve as an affidavit for purposes of summary judgment if it is based on personal knowledge and if it sets forth the requisite facts with specificity. *See Lopez v. Smith*, 203 F.3d 1122, 1132 n.14 (9th Cir. 2000) (en banc) ("A plaintiff's verified complaint may be considered as an affidavit in opposition to summary judgment if it is based on personal knowledge and sets forth specific facts admissible in evidence.").

Because appellants have not sufficiently established the elements of a battery claim, we conclude that summary judgment is appropriate and therefore affirm the district court's grant of summary judgment as to that claim.[17]

## Conclusion

We hold that appellants have failed to establish a prima facie case of discrimination, given that the enactment of the Negro League Plans did not constitute an adverse employment action and given that the two groups of players are not similarly situated. Even if appellants had made such a prima facie showing, we would conclude that appellees have provided a legitimate, non-discriminatory and non-pretextual reason for their decision to implement the Plans. Therefore, we hold that summary judgment is appropriate as to appellants' Title VII claim. Appellants have failed to present sworn specific facts tending to show that there was a substantial risk of injury as a result of the administration of the cortisone shots and other drugs, that MLB's team doctors and trainers knew of such substantial risks and deliberately withheld such information from appellants, or that they affirmatively misled them as to the nature of the treatment they prescribed; therefore, appellants have failed to raise a genuine issue of material fact as to the elements of a battery claim. For that reason, we hold that summary judgment is appropriate as to appellants' battery claim as well.

**AFFIRMED.**

---

[17]The claim supported by their declarations — that appellants were not adequately informed of the risks inherent in the treatment — is a claim that has been characterized by California courts as negligence, not battery. *See Cobbs*, 502 P.2d at 8 (stating also that "California authorities have favored a negligence theory" and that "the trend appears to be towards categorizing failure to obtain informed consent as negligence"); *see also Trantafello v. Med. Ctr. of Tarzana*, 182 Cal. App. 3d 315, 322 n.6 (1986) ("Where the doctor fails to inform the patient of all the material risks and potential complications, the action sounds in professional negligence . . . ."). As noted above, appellants withdrew their negligence claim in the district court.