IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

MERCEDES PEREZ-MELGOSA, PhD,  )    No. 73627-2-I
an individual,                )
                              )
                Appellant,    )
                              )    UNPUBLISHED OPINION
        v.                    )
                              )
STATE OF WASHINGTON,          )
                              )
                Respondent.   )    FILED: August 15, 2016
_____ )

SCHINDLER, J. — Mercedes Perez-Melgosa, PhD filed a lawsuit against the

University of Washington (UW) under the Washington Law Against Discrimination,

chapter 49.60 RCW. Dr. Perez-Melgosa alleged wage discrimination, retaliation,

disparate treatment, and hostile work environment. The court dismissed the wage

discrimination and retaliation claims on summary judgment but denied dismissal of the

disparate treatment and hostile work environment claims. A jury returned a verdict in

favor of the UW on the disparate treatment and hostile work environment claims. On

appeal, Dr. Perez-Melgosa challenges summary judgment dismissal of her wage

discrimination claim.[1] We affirm summary judgment dismissal of the wage

discrimination claim.

_____

[1] Dr. Perez-Melgosa does not appeal summary judgment dismissal of her retaliation claim.

FACTS

Mercedes Perez-Melgosa is of Spanish national origin. She has a PhD in molecular biology from the Universidad Autonoma de Madrid, Spain. Dr. Perez-Melgosa describes her accent as "thick Castilian."

In 1994, Dr. Perez-Melgosa began a postdoctoral fellowship in immunology with Dr. Christopher Wilson at the University of Washington (UW). In 2001, Dr. Perez-Melgosa was appointed as a research scientist and worked on the "Smallpox Vaccine Myocarditis Study" (the Smallpox Project) in Dr. Wilson's lab. The Smallpox Project was funded by the Multicenter National Institutes of Health and the United States Department of Defense. Jeff Furlong worked in Dr. Wilson's lab on information technology for the Smallpox Project.

In 2009, Dr. Wilson decided to retire. Dr. Wilson asked UW Genome Sciences Professor Deborah Nickerson, PhD to assume responsibility for the Smallpox Project. Dr. Nickerson was the head of the UW Department of Genome Sciences lab. Dr. Nickerson administered approximately $30 million in annual contracts and grants. Approximately 40 people worked in Dr. Nickerson's lab on projects related to DNA[2] sequencing and analysis.

After meeting with Dr. Perez-Melgosa and Furlong, Dr. Nickerson agreed to assume responsibility for the Smallpox Project. Dr. Perez-Melgosa and Furlong were the only employees in Dr. Nickerson's lab who worked on the Smallpox Project.

Lab employees worked in one of three different categories: (1) lab employees with managerial duties, such as "leads;" (2) bioinformatics or computer analysts who did

_____

[2] Deoxyribonucleic acid.

2

computer programming and analysis; and (3) noncomputational scientists who performed tasks such as organizing samples, ordering supplies, and running assays.

Dr. Perez-Melgosa worked in Dr. Nickerson's lab as a "Research Scientist Engineer 3" (RSE-3) noncomputational scientist. From January 1, 2010 until November 1, 2012, Dr. Perez-Melgosa was the twelfth highest paid employee in Dr. Nickerson's lab and was the highest paid noncomputational scientist.

Dr. Perez-Melgosa was the research scientist and coordinator for the Smallpox Project. Because the Smallpox Project was unlike any other project in Dr. Nickerson's lab, Dr. Perez-Melgosa reported directly to Dr. Nickerson instead of reporting to one of the lab managers.

Dr. Nickerson was a demanding supervisor who imposed high performance standards on employees. Dr. Nickerson had little tolerance for lack of attention to detail, sound judgment, or accountability. When an employee did not meet performance expectations, Dr. Nickerson would often get frustrated and yell at the employee. No one in the lab was exempt from Dr. Nickerson's outbursts. There is no dispute the outbursts and yelling were always related to work performance and never personal.

Catherine Igartua, an employee in Dr. Nickerson's lab who is also from Spain, described Dr. Nickerson's management style as "honest and direct." Igartua said that while Dr. Nickerson could be quick to criticize work performance, Dr. Nickerson never said anything offensive to anyone.

Dr. Nickerson admitted that she yells at employees when they fail to perform their jobs to her satisfaction and that she yelled at Dr. Perez-Melgosa about poor recordkeeping.

The Washington legislature imposed a statewide salary freeze beginning February 2009 and lasting until June 2013. While the salary freeze was in effect, salary increases were allowed only if (1) the employer showed difficulty retaining critical and qualified employees, (2) an existing position was reclassified to a higher salary grade or a different job category for functioning at a higher level or performing job duties different from those expected for the current job category, or (3) the employee obtained a promotion through the competitive job application process.

At some point in 2010, Dr. Perez-Melgosa asked Dr. Nickerson for a raise and promotion to RSE-4. Dr. Nickerson denied the request. Dr. Nickerson told Dr. Perez-Melgosa there was a "[f]reeze on raises in the State of Washington" and "even [Dr. Nickerson] had not received a raise."

During the four years the salary freeze was in effect, some lab employees received a salary increase. For example, a lab manager recommended RSE-2 Mallory Beightol receive a raise effective February 1, 2012 in order to retain and prevent her from leaving for a higher-paying position. And RSE-2 Christian Frazar received a raise effective November 1, 2012 in an effort to retain him.

Beginning in spring 2012, Dr. Nickerson began having concerns about the progress of the Smallpox Project and the quality of Dr. Perez-Melgosa's work. The most significant and ongoing concern related to Dr. Perez-Melgosa "changing" the results of a quality control (QC) test without authorization. The QC team in Dr. Nickerson's lab was solely responsible for conducting and interpreting QC test results. Dr. Perez-Melgosa did not notify QC or anyone else in the lab that she had changed the test results. In Dr. Nickerson's opinion, changing the results of the QC test was "a

serious overstep of [Dr. Perez-Melgosa's] duties and responsibilities in the Lab and demonstrated exceedingly poor judgment." Dr. Nickerson decided she could no longer trust work performed by Dr. Perez-Melgosa. Dr. Nickerson directed other lab employees to analyze and redo Dr. Perez-Melgosa's most recent work.

The UW terminated Dr. Perez-Melgosa's employment effective November 19, 2012. The reasons for termination were "an absence of judgment in changing research data and lack of authority to change the data results without seeking proper clarification from colleagues and the lab manager." Dr. Perez-Melgosa submitted a rebuttal to the reasons for terminating her employment. Human Resources concluded Dr. Perez-Melgosa failed to identify any factual errors related to the basis for her dismissal.

Dr. Perez-Melgosa filed a lawsuit against the UW alleging disparate treatment, hostile work environment, wage discrimination, and retaliation in violation of the Washington Law Against Discrimination (WLAD), chapter 49.60 RCW.

The UW filed a motion for summary judgment dismissal of the lawsuit. The court dismissed the retaliation and wage discrimination claims. The court denied summary judgment dismissal of the disparate treatment and hostile work environment claims. After a nine-day trial, the jury returned a verdict in favor of the UW on the disparate treatment and hostile work environment claims.

ANALYSIS

Dr. Perez-Melgosa appeals summary judgment dismissal of her wage discrimination claim. We review summary judgment de novo, engaging in the same inquiry as the trial court. Neigh. All. of Spokane County v. Spokane County, 172 Wn.2d 702, 715, 261 P.3d 119 (2011). Summary judgment is appropriate when there is no

5

genuine issue of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c). We view all facts and reasonable inferences in the light most favorable to the nonmoving party. Young v. Key Pharm., Inc., 112 Wn.2d 216, 226, 770 P.2d 182 (1989).

A defendant moving for summary judgment has the initial burden to show the absence of genuine issues of material fact. Young, 112 Wn.2d at 225. If the defendant makes this initial showing, the burden shifts to the plaintiff to set forth specific evidence establishing a genuine issue of material fact. Young, 112 Wn.2d at 225 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).

The plaintiff cannot meet its burden by relying on speculation or "mere allegations, denials, opinions, or conclusory statements" to establish a genuine issue of material fact. Int'l Ultimate, Inc. v. St. Paul Fire & Marine Ins. Co., 122 Wn. App. 736, 744, 87 P.3d 774 (2004) (citing CR 56(e); Grimwood v. Univ. of Puget Sound, Inc., 110 Wn.2d 355, 359, 753 P.2d 517 (1988)). While we construe all evidence and reasonable inferences in the light most favorable to the nonmoving party, if the plaintiff fails to make a showing sufficient to establish the existence of a material issue of fact, summary judgment is proper. Young, 112 Wn.2d at 225.

As a preliminary matter, we note that throughout her brief, Dr. Perez-Melgosa repeatedly cites to trial testimony and trial exhibits to argue the court erred in dismissing the wage discrimination claim on summary judgment. The UW also cites to the trial record. Under RAP 9.12, we consider only evidence that was before the court on summary judgment and disregard the citations to evidence presented at trial. Taliesen Corp. v. Razore Land Co., 135 Wn. App. 106, 129, 144 P.3d 1185 (2006).

Because the WLAD is patterned after Title VII of the Civil Rights Act of 1964, 42 U.S.C. section 2000e-2, Washington courts rely on federal law and decisions interpreting Title VII. See, e.g., Oliver v. Pac. Nw. Bell Tel. Co., 106 Wn.2d 675, 678, 724 P.2d 1003 (1986); Tafoya v. Human Rights Comm'n, 177 Wn. App. 216, 224, 311 P.3d 70 (2013).

Where, as here, the plaintiff lacks direct evidence of discrimination, the McDonnell Douglas burden-shifting analysis applies to the order and nature of proof on summary judgment. Scrivener v. Clark College, 181 Wn.2d 439, 445, 334 P.3d 541 (2014) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)).

Under McDonnell Douglas, the plaintiff has the initial burden of establishing a prima facie case of discrimination that creates a presumption of discrimination. Scrivener, 181 Wn.2d at 446. If the plaintiff establishes a prima facie case, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. Scrivener, 181 Wn.2d at 446. The plaintiff must then produce evidence that "creates a genuine issue of material fact that the employer's articulated reason was a pretext for a discriminatory purpose." Scrivener, 181 Wn.2d at 446. If the plaintiff fails to meet the burden of production requirements, the defendant is entitled to judgment as a matter of law. Hill v. BCTI Income Fund-I, 144 Wn.2d 172, 182, 23 P.3d 440 (2001).

To establish a prima facie case of disparate treatment based on national origin, Dr. Perez-Melgosa must show (1) she belongs to a protected class; (2) she was treated less favorably in the terms and conditions of her employment than a similarly situated

7

nonprotected employee, or "comparator;" and (3) she and the nonprotected comparator were doing substantially similar work. Domingo v. Boeing Emps.' Credit Union, 124 Wn. App. 71, 81, 98 P.3d 1222 (2004). Although a plaintiff's prima facie burden at the summary judgment stage is not onerous, Dr. Perez-Melgosa has not met that burden. See Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981).

Under federal employment discrimination law, employees are similarly situated if they are directly comparable or similarly situated in all material respects. Raymond v. Ameritech Corp., 442 F.3d 600, 610 (7th Cir. 2006); Moran v. Selig, 447 F.3d 748, 755 (9th Cir. 2006). The plaintiff must be similarly situated in all relevant aspects and nearly identical to the employees who are allegedly treated more favorably. Pierce v. Commonwealth Life Ins. Co., 40 F.3d 796, 802 (6th Cir. 1994). The purpose of the "similarly situated" requirement is "to eliminate other possible explanatory variables" such as differing roles, performance history, or decision-making personnel that help isolate the critical independent variable—"discriminatory animus." Coleman v. Donahoe, 667 F.3d 835, 846 (7th Cir. 2012).

Factors relevant to determining whether employees are comparable for purposes of a wage discrimination claim include whether the employees had the same job description, were subject to the same standards, were subordinate to the same supervisor, and had comparable experience, education, and other qualifications. Bagwe v. Sedgwick Claims Mgmt. Servs., Inc., 811 F.3d 866, 885 (7th Cir. 2016); Ajayi v. Aramark Bus. Servs., Inc., 336 F.3d 520, 532 (7th Cir. 2003); Marin v. King County, No. 72666-8-I, 2016 WL 4041860, at *5 (Wash. Ct. App. June 6, 2016).

Dr. Perez-Melgosa presented no evidence that Dr. Nickerson denied her request for a promotion and a raise because of her national origin or that she was treated differently than similarly situated employees or comparators. Dr. Perez-Melgosa presented no evidence of comparability to any other employee in Dr. Nickerson's lab such as experience, job descriptions, education, and other qualifications. Dr. Perez-Melgosa cannot establish a prima facie case of wage discrimination by simply producing a chart comparing her salary with that of another employee with the same job title. Bagwe, 811 F.3d at 884-85.

To the extent that Dr. Perez-Melgosa is arguing lab employees Cynthia Shephard, Colleen Davis, and Jessica Pijoan are comparators, her argument fails. It is undisputed there were three categories of employees in the lab and employees in each category were paid according to different salary schedules. It is undisputed that Dr. Perez-Melgosa was classified as an RSE-3, the noncomputational scientist category. However, according to the chart Dr. Perez-Melgosa submitted in opposition to summary judgment, both Pijoan and Shephard were RSE-2s and Davis was a "Research Coordinator" and "Program Operations Specialist."

Even if Dr. Perez-Melgosa had made a prima facie showing of disparate treatment, she fails to show that Dr. Nickerson's reasons to deny her request for a promotion and raise are pretextual. A plaintiff may show the defendant's legitimate nondiscriminatory reasons are pretextual by showing the reasons (1) had no basis in fact, (2) were not really motivating factors for its decision, (3) were not temporally connected to the adverse employment action, or (4) were not motivating factors in employment decisions for other employees in the same circumstances. Scrivener, 181

9

Wn.2d at 447. The plaintiff may also satisfy the pretext prong by "presenting sufficient evidence that discrimination nevertheless was a substantial factor motivating the employer." Scrivener, 181 Wn.2d at 448.

There is no evidence that the reason to deny her request for a salary increase was either pretextual or a substantial motivating factor. The stated reason for denying Dr. Perez-Melgosa's request for a salary increase in 2010 was the statewide wage freeze in effect at the time. Below, Dr. Perez-Melgosa argued the statewide wage freeze was pretextual because all the other employees in Dr. Nickerson's lab received promotions or retention increases as a means of circumventing the wage freeze. Dr. Perez-Melgosa relied on a chart that purported to show salary increases and promotions for all employees in Dr. Nickerson's lab.

But the undisputed testimony of UW Department of Genome Sciences Director Nancy Cameron establishes the chart was misleading and did not support Dr. Perez-Melgosa's argument. The chart (1) omits 15 employees who did not receive salary increases, most of whom were noncomputational employees like Dr. Perez-Melgosa; (2) includes salary raises that were given after Dr. Perez-Melgosa was no longer an employee of the lab; (3) includes raise information for an employee who was paid on a pay scale applicable to faculty members, not the pay scale applicable to Dr. Perez-Melgosa; (4) lists personnel action taken in 2011 for an employee who did not start working in Dr. Nickerson's lab until 2012; and (5) lists salary information for an individual who was not hired until after Dr. Perez-Melgosa left the lab. The chart also incorrectly shows Furlong received a 2.2 percent salary increase when in actuality his salary remained unchanged from his start date. The chart shows Dr. Perez-Melgosa was the

highest paid noncomputational scientist in the lab and was paid more—in some instances substantially more—than 7 other lab employees classified as RSE-3s.

At oral argument, Dr. Perez-Melgosa's attorney conceded that not all of the employees in Dr. Nickerson's lab received a salary increase while the wage freeze was in effect.

Dr. Perez-Melgosa points to the salary increases given to lab employees Shephard, Davis, and Pijoan during the wage freeze as evidence of pretext. The record shows the UW gave Shephard a raise in an effort to discourage her from looking for a higher-paid position in the private sector. And as a lead in Dr. Nickerson's lab, Davis received salary increases as a reflection of the critical role she played in overseeing the administrative aspects of the lab.

The record shows Pijoan received a subpar score on a performance evaluation because of contaminated samples. But the samples were contaminated primarily because plate seals failed rather than any deficiency in Pijoan's work performance. And contrary to Dr. Perez-Melgosa's assertion, the record shows Pijoan received a raise not for retention purposes but rather as a reflection of her "ongoing responsibilities and contributions" to the Department of Genome Sciences.

There is no dispute Dr. Perez-Melgosa never stated an intent to leave her job for a higher-paying position elsewhere. There is also no dispute Dr. Perez-Melgosa did not assume any additional work or responsibilities but rather asked for a raise for doing the same work she had always done in the lab.

Nor is there any evidence that Dr. Perez-Melgosa's national origin was a substantial motivating factor in the decision to deny her request for a raise or had

11

anything to do with the decision to deny her request for a raise. While working in the lab, Dr. Perez-Melgosa never reported that Dr. Nickerson discriminated against her because of her national origin. Dr. Perez-Melgosa testified Dr. Nickerson never said anything to her about her national origin or her accent that she considered to be derogatory.

We affirm summary judgment dismissal of the wage discrimination claim.[3]

WE CONCUR:

_____

_____

_____

---

[3] Accordingly, we need not address the assignments of error to the evidentiary rulings Perez-Melgosa argues "should be corrected for remand."